Eddie L. MacCLAIN, Appellant,

v.

Karl J. BULES et al., Appellees.

Samuel C. PANDOLFO, Appellant,

v.

Karl J. BULES et al., Appellees.

Nos. 16135, 16136.

United States Court of Appeals
Eighth Circuit.

March 10, 1960.

Francis Murphy, and Richard W. Anderson, Fargo, N. D., for appellants.

Thorpe & Babcock, Sidney, Neb., for appellees.

Before JOHNSEN, Chief Judge, and SANBORN and VAN OOSTERHOUT, Circuit Judges.

JOHNSEN, Chief Judge.

The appellants here, MacClain and Pandolfo, Colorado residents, had in 1955 engaged in selling some capital stock of General Resources, Ltd. (a Colorado oil corporation, with its offices at Denver), in the area of Sidney, Nebraska. A banker in Sidney provided some names of prospects. One name given by him to MacClain was that of appellee Karl J. Bules.

Bules was a wheat farmer, 74 years of age, with schooling to the third grade, but he had accumulated a substantial amount of cash, most of which he kept at his home instead of in a bank. MacClain was successful in persuading Bules and his wife to make three successive purchases of the oil stock, each in the amount of $10,000.

The dates of the purchases were respectively March 4, 1955, June 2, 1955, and November 12, 1955. While MacClain was careful to get the money into his hands, the instrument which he had the Bules sign on each occasion was in form a capital stock subscription and not a sales contract. The language of the form was, "I hereby subscribe for . . . . . . shares of the capital stock of General Resources, Ltd. * * *". There was no expressed obligation on the part of General Resources, Pandolfo or MacClain which in terms prevented them from choosing between making delivery of the stock or a return of the cash. MacClain, however, made a notation on each

of the instruments, "Received Payment $10,000 Eddie L. MacClain, Salesman".

The certificates covering the subscriptions were delivered to the Bules on April 2, 1955, June 29, 1955, and December 20, 1955. The certificates showed that they had been issued by General Resources, Ltd. at its offices in Denver. As to the first two certificates, deliveries were made in person to the Bules at their home, with interstate transportations of the securities from Colorado to Nebraska thus necessarily having had to be involved. The third delivery was made to the Bules by mail, sent to them from Denver.

The oil stock had not been the subject of a registration with the Securities and Exchange Commission, under the provisions of the Securities Act of 1933, 15 U.S.C.A. § 77f et seq. Section 77e(a) (2) makes it unlawful, unless a registration statement is in effect as to a security subject to the Act, for any person, directly or indirectly, "to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale". And § 77l, as here material, creates a civil liability in respect to such securities as follows:

"Any person who—

"(1) sells a security in violation of section 77e of this title, or

"(2) sells a security * * * by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact * * *, and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth * * *,

shall be liable to the person purchasing such security from him, * * * to recover the consideration paid for such security with interest thereon * * *."

The Bules brought suit on December 18, 1956, under § 77l, against General Resources, Ltd., Royal Oil & Gas Co. (which had then assumed the liabilities of General Resources), MacClain and Pandolfo, to recover the $30,000 which they had paid for the stock. The court, on a trial without a jury, gave the Bules judgment in this amount and interest, against all of the parties just named. Only MacClain and Pandolfo have appealed.

The banker referred to above had also been made a party-defendant in the action, but the court denied recovery against him, on the ground that the evidence did not sufficiently establish that he had been a participant in or beneficiary of the unlawful and fraudulent scheme for selling the stock, in which the court regarded General Resources, Pandolfo and MacClain as having been collectively engaged. Other claims on the part of the Bules for fraud in respect to some interests in oil leases, which also had been sold to them, and other parties-defendant, alleged to have had a relationship to these sales in addition to Pandolfo and MacClain, were included in the suit, but the court's disposition of all the matters referred to in this paragraph has been permitted to become final, so that these aspects are not involved in or material on this appeal.

Appellants' first contention for reversal is that the sales made to the Bules of the stock were outside the remedial provisions of § 77l, supra, because a use of interstate transportation or of the mails was not involved in the solicitation and selling of the stock but at most only in the delivery of the certificates.

We agree with the holdings in Schillner v. H. Vaughan Clarke & Co., 2 Cir., 134 F.2d 875; Blackwell v. Bentsen, 5 Cir., 203 F.2d 690; Moore v. Gorman, D.C.S.D.N.Y., 75 F.Supp. 453, and Athas v. Day, D.C.Colo., 161 F.Supp. 916, that the term "sells", as used in § 77l, involves as an inherent element the delivery engaged in as to a security. Hence, "the use of any means of instruments of transportation * * * in

interstate commerce or of the mails" to effect the delivery of a security as much brings a situation within the remedial provisions of § 77l(2) as does such a use which represents an incident of any other element of its sale.

■ Kemper v. Lohnes, 7 Cir., 173 F.2d 44, takes a contrary view and holds that the remedy under § 77l(2), for use made of interstate commerce or the mails in relation to sales involving untrue statements of a material fact, should be limited to the use made of these facilities as to the prospectuses or communications employed in the sale. This seems to us an artificial interpretation and unwarranted curbing of the operation of § 77l, which manifestly is a remedial statute, and which, as said in Blackwell, supra, 203 F.2d at page 693, "should be liberally construed to accomplish the dominant legislative purpose in adopting it, which is to prevent the use of the mails, and other instrumentalities of interstate commerce, in the perpetration of investment frauds."

The next contention of appellants is that the evidence failed to establish that "an untrue statement of a material fact" was made in the sale of the stock, within the requirement of § 77l(2), supra, in that what MacClain had said as to the value of the stock could not be regarded as anything more than sales talk or expression of personal opinion.

Bules testified that MacClain had, on each of the three occasions, represented that the stock was worth $1.00 a share. MacClain had added that the stock probably would have a value, inside of a year, of up to $2.00 to $2.50 a share. He could properly be regarded as not purporting to be referring to disposal opportunity but investment or holding value, for what he predicated his expression as to prospectiveness on was an emphasizing of Pandolfo's alleged experience and success in bringing in producing oil wells, which factor could only be related to the leases or properties which the corporation held.

■ MacClain denied making at any time the representation that the stock was worth or had a value of $1.00 a share. The court, however, on personal observation and credibility evaluation of the witnesses, found that MacClain had made the statements as testified to by Bules. The court made the further finding that what MacClain was seeking to induce the Bules to believe by his statement as to the $1.00 value of the stock, and what the Bules had a right to regard his statement as meaning, was that the corporation had assets underlying its stock of a net worth or book value amounting to $1.00 per share. These findings are here entitled to stand.

The court's appraisal of the nature and significance of MacClain's statement in the particular situation rested on a number of reasonable implicational elements. Thus, MacClain did not, of course, contend in his testimony that he meant to convey the impression to the Bules that a market existed for the stock, and that they thus would have no difficulty in disposing of it at any time. If that had been his purpose, his representation as to the $1.00 value of the stock, which the court found that he had made, would have left the situation equally vulnerable. This would be so because MacClain knew as a fact that the stock was without buying or selling price from any market or counter activity. And he and Pandolfo had manifestly been relating the varying prices which they asked for the stock to the amount which they thought they would be able to obtain from the particular person being solicited.

In the case of the Bules, MacClain asked and got, as to the first two sales, the exact amount which he claimed constituted the value of the stock—$1.00 a share. The aspect of speculativeness which he held out to them as an inducement lay not in this figure but, as referred to above, in the potentiality of the assets or property underlying this value, in relation to the application of Pandolfo's alleged experience and success in bringing in producing wells.

In the third sale, MacClain repeated the representation as to the $1.00 value of the stock, presumably as a basis for

reassuring the Bules that they were not risking their accumulated substance. Then, as a means of getting another $10,000 out of them, he stated that he would this time let them have 20,000 shares (an amount equal to the total of their first two purchases) at only 50 cents a share. The reason he gave for this magnanimity was that he was in need of cash to take care of some income tax difficulties. And so he further told them that this particular stock was his own and not stock belonging to the corporation, although, as previously noted, he still had them sign a subscription form, the same as for the two preceding purchases, and again made notation thereon of his receipt of the $10,000 as "Salesman".

This third sale and its incident as to price could be regarded as additionally demonstrating, we think, that what Mac-Clain was intending to convey to the Bules by his statement as to the $1.00 value of the stock was not his opinion of what they could get for the stock in case they wanted to sell it, but the intrinsic worth of it in terms of its existing asset or book value as an investment basis.

In incidence to the trial court's view that MacClain's representation was in the circumstances of the situation entitled to be regarded as having had this significance, there may be noted the holding of the Nebraska Supreme Court in Trebelhorn v. Bartlett, 154 Neb. 113, 47 N.W.2d 374, that the actual value of corporate stock which has no market value, because it is all common stock closely held and not listed or actively traded in on any stock exchange, is ordinarily determinable on the basis of the net worth of the corporation at the time divided by the number of bona fide shares issued and outstanding.

■ Here, the par value of the stock was a penny a share. MacClain had made sales of it to other purchasers in the area at the varying prices of ten cents, twenty-five cents, and fifty cents a share. There was evidence establishing that the asset or book value of the stock was, not

$1.00 a share, but .8 cent a share on February 28, 1955, 2.5 a share on May 31, 1955, and 5 cents a share on October 31, 1955. The court found that the stock never had a value of more than 5 cents a share, either at the time of the sales to the Bules or at the time of the trial, and that thus MacClain's representation in each of the sales that the stock was worth $1.00 a share was false, and that the Bules had relyingly been defrauded thereby. A tender back of the stock was made by the Bules in their complaint.

■ Appellants next contend that the stock, in its sale to the Bules, was not within the registration requirements of the Securities Act of 1933, but was exempt under 15 U.S.C.A. § 77d(1), as "not involving any public offering". MacClain had interlined the expression "(private offering)", in the instruments which he had the Bules sign, following the words "Capital Stock of General Resources, Ltd." But an artificiality such as this would not, of course, be capable of controlling the application of the statute. The Bules were solicited as members of the public in the Sidney area, without tie or relationship or knowledge as to General Resources, Ltd., from which it could be said that they had access to the kind of information which registration would have disclosed, or that they were otherwise not in need of the benefit of the safeguards which the statute was designed to afford.

The Supreme Court has said that the focus of inquiry on an issue as to "public offering" is essentially the question of "the need of the offerees for the protections afforded by registration". Securities & Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 127, 73 S.Ct. 981, 985, 97 L.Ed. 1494. See also Woodward v. Wright, 10 Cir., 266 F.2d 108. "The natural way to interpret the private offering exemption is in light of the statutory purpose. * * * An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering'." 346 U.S.

at pages 124 and 125, 73 S.Ct. at page 984.

But it is urged that the last two sales at least had involved stock standing in the name of MacClain, and that they thus were exempt under § 77d(1) as "Transactions by any person other than an issuer, underwriter, or dealer". The trial court found, however—and the evidence with the inferences capable of being drawn warranted the finding—that the stock-selling activities in which Mac-Clain and Pandolfo had engaged in the Sidney area were simply a general scheme and device on the part of General Resources, Ltd. and Pandolfo and Mac-Clain to avoid registering the stock and to thwart the provisions of the Securities Act.

General Resources, Ltd. had been organized by Pandolfo, and all of its issued stock (6,041,800 shares) was put by Pandolfo in the names of himself and the members of his family. The records of the corporation had been made to show that there had been received by it the amount of one penny a share for the stock either in property or cash. But the court did not accord to this a conclusive acceptance or significance, since MacClain, as purported agent for the corporation, had represented to the Bules in the first two sales that he was selling them stock on behalf of the corporation; he had signed receipts in all three transactions as "Salesman"; Bules had brought $10,000 in cash to the bank at the time of the first purchase and had had a draft or money order issued to the order of General Resources, Ltd. in payment for the stock; Pandolfo had made endorsement of the instrument on behalf of the corporation as its president; the corporation's records showed no stock standing in the name of MacClain at the time the first sale was made; and the form and mode of issuance of the certificate on this sale were supportive of the implications inherent in these facts.

While, within a short time after the Bules' first purchase, a million shares of stock had been made to appear in the name of MacClain on the corporation's records, he admitted that he had made no payment therefor at the time other than to sign a note in an amount equal to 5 cents a share for the stock. And later, apparently when it developed that he was not going to be able to peddle this much stock, there was turned back by him to the corporation 500,000 of the 1,000,000 shares which had been purportedly transferred to him.

These circumstances made the situation rationally subject to the inference and conclusion, as noted above, that the transactions as to the Bules, as well as to others, had constituted part of a general scheme, device, design and participation, on the part of General Resources, Ltd., Pandolfo and MacClain for their mutual benefit, to effect sales of the corporation's stock to the public in violation of the requirements of the Securities Act.

Pandolfo argues, however, that there was nothing to tie him personally to the sales or representations made by Mac-Clain to the Bules. Pandolfo's organization and control of the corporation have previously been referred to. The realities which could be regarded as existing between him and MacClain in relation to the latter's stock-selling activities have also been noted, including his presence at the bank when the first sale was made to the Bules; his endorsement of the draft; the non-payment of any cash by MacClain for the stock transferred to his name; and Pandolfo's allowance of a turn-back to be made by MacClain of the one-half million shares after the "sucker" market had apparently commenced to run dry.

The corporation was Pandolfo, as much as he saw fit to make it so. He chose, sometime during 1955, for reasons which would seem to be apparent, to have someone else take over the title of president of the corporation, but, in the answers made to interrogatories submitted by appellees, he spoke of himself as having been connected with the corporation "From the date of organization of said company to December 15, 1955". By that time, as the record suggests, he

was ready to move on to other ventures and fields of endeavor.

■ We think the court was entitled to hold Pandolfo liable, along with Mac-Clain, for the monies collected from the Bules, under the scheme in which they had engaged to sell General Resources stock in violation of the Securities Act, and in the relationship which could be regarded as being involved between them as to the sales of stock made. Pandolfo had the responsibility to have the stock registered, when he had MacClain engage in its sale. And in his desire to have MacClain make sales of the stock to the public, the circumstances in the record entitled the trier of the facts to be persuaded that MacClain was not just acting in his own behalf, but in Pandolfo's also.

The last contention made by appellants is that any liability which they might have had was barred by the statute of limitations. Under 15 U.S.C.A. § 77m, any action to enforce liability under § 77l(1), supra, must be brought within one year after the violation upon which it is based, and any action to enforce liability under § 77l(2), supra, must be brought within one year after the discovery of the untrue statement, or after such discovery should have been made by the exercise of reasonable diligence.

■■ The action, as has been noted, was instituted on December 18, 1956, with the three sales involved having been consummated through delivery of the certificates on April 2, 1955, June 29, 1955, and December 20, 1955, respectively. Thus, as to the third sale, appellants' contention as to limitations may be summarily disposed of on the basis of § 77l (1). And as to the first and second sales, we think the evidence warranted the trial court in finding that the Bules had not discovered the fact of the falsity of Mac-Clain's representation as to the value of the stock before the delivery of the third certificate on December 20, 1955, and that they could not by the exercise of reasonable diligence have been ex-

pected to have made such discovery previously. Thus, the contention of limitations as to these two sales is disposed of by § 77l(2).

The judgments are affirmed.