**Solomon KATZ, Plaintiff-Appellant-Appellee,**

v.

**AMOS TREAT & CO., Amos Treat, Donald Nardone, Earl J. Wofsey, A. Thomas Ewbank and James Earley, Defendants-Appellees-Appellants,**
**and**

**Delka Research Corp. of New Jersey, Delka Research Corp. of Delaware, Eugene M. Walsh, E. Gerard McGovern, David Foxman, George Grabovitz, Anna Miranda, as Executrix of the Estate of Jerry Miranda, Salvatore Miranda, also known as Sam Miranda, Defendants.**

Nos. 458–461, Dockets 32408, 32471, 32481, 32482.

United States Court of Appeals Second Circuit.

Argued March 27, 1969.

Denied May 16, 1969.

---

3. The statute involved required the railroad to comply with any "reasonable request" for service.

Louis Haimoff, New York City, (Blum, Haimoff, Gersen & Szabad, New York City; (Harvey J. Fried, New York City, of counsel), for plaintiff-appellant-appellee.

Joseph Spain, New York City, (Royall, Koegel, Rogers & Wells, New York City; William F. Koegel, New York City, of counsel), for defendant-appellee-appellant Donald Nardone.

Myron S. Isaacs, New York City, (Rembar & Zolotar, New York City; Michael Brush, New York City, of counsel), for defendants-appellees-appellants Amos Treat & Co., Inc. and Amos Treat.

John Demcisak, Philadelphia, Pa., (Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa.), for defendant-appellee-appellant A. Thomas Ewbank.

Peter P. Smith, III, New York City, (Shea, Gallop, Climenko & Gould, New York City), for defendant-appellee-appellant James Earley.

Nathan Hirschberg, New York City, (McAloon, Hirschberg & Malang, New York City; Lawrence M. Klein, New York City, of counsel), for defendant-appellee-appellant Earl J. Wofsey.

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

This is one of those appeals where the briefs read as if addressed to different cases. According to the plaintiff, defendants engaged in the sale of unregistered stock and in tactics typical of the "boiler room" operations with which this court has had all too much occasion to become familiar. According to the defendants, plaintiff's own showing demonstrated his knowing and eager participation in all that was done. In such cases each side usually has presented its version of what occurred and the differences have received needed resolution by the trier of the facts, in this case a jury. Here that was aborted by a judgment dismissing the complaint at the close of the plaintiff's case.[1] We hold this to have been error with respect to four of the appellees, although correct concerning the other two.

Plaintiff, Dr. Solomon Katz, is a dentist by profession and an operator in securities by avocation. The defendants with whom we are concerned are Amos Treat & Co., a stock brokerage corporation; Amos Treat, its president; Donald Nardone, a customer's man; James Earley and A. Thomas Ewbank, who were directors and high officers of Delka Research Corp. during the period in which its stock was sold to Katz; and Earl J. Wofsey, special counsel for Delka and attorney for Amos Treat & Co. in connection with its proposed underwriting of Delka's stock. Count I of the complaint, filed on January 29, 1963, alleged that in September 1960, defendants had sold plaintiff 20,000 shares of Delka stock for $50,000 and in April and May 1961, 60,000 such shares for $100,000, and that such shares were not registered although § 5 of the Securities Act required them to be; defendants were therefore alleged to be liable under § 12. The remaining five counts, based on §§ 12(2) and 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and common law, alleged various fraudulent misrepresentations, of which more hereafter.[2]

---

1. While the judge did not file an opinion in support of the dismissal, his reasons can be gleaned from the colloquy with counsel and from his opinion denying defendants' motion to assess costs against plaintiff. Katz v. Delka Research Corp., 295 F.Supp. 647 (S.D.N.Y.1968).

2. The appeal illustrates the benefits of the Joint Appendix required by FRAP 30,

## I. *Plaintiff's Version of the Facts*

Katz was the main witness on his own behalf.[3] He was an active customer of Amos Treat & Co., as well as of many other brokerage firms. Nardone, who had been servicing his account at Treat for some two years, had told him of a "privileged group" consisting of friends of Amos Treat and "special customers," who were let in on stock "before it zoomed." In late August 1960, Nardone informed Katz by telephone that his lucky time had arrived. Nardone had "come across a situation that really looks tremendous." Amos Treat & Co. was supposed to underwrite a new issue which Treat thought "one of the best issues that he ever had," and on this occasion Katz was to be allowed among the favored few. Katz was interested. Nardone later advised that the company was in the plastic coating business; that it had "a special process that nobody else could invent"; and "that it looked very, very promising." A few days thereafter Nardone invited Katz to attend a meeting of stockholders and prospective investors at the company's plant in New Jersey. Mr. Treat had allotted $100,000 worth of securities to Nardone, who inquired whether Katz' brother-in-law, Pinson, might not also be interested.

Upon the appointed day Nardone drove Katz and Pinson to the plant. When Katz expressed some misgivings about investing in companies before a public issue, Nardone reassured him that "we do it all the time." About 60 people were assembled when one Walsh introduced himself as Delka's new president and welcomed the friends who he hoped would become stockholders. Katz was assigned to a group, which included Treat and generally Nardone, who were conducted through the plant by company officers. They saw machinery and were told that the company was "growing by leaps and bounds" and would need plants all over the country. Workmen in a shipping area appeared to be busily packing cartons, and company officers said they couldn't keep up with the orders. After further displays and conversation, and evasion by Walsh of what seems to have been the only intelligent inquiry propounded—a request by Pinson, a certified public accountant, to look at the books—Katz and Pinson joined the others for a luncheon meeting. Walsh modestly acknowledged that the prospective investors had "seen a show that is one of the most stupendous things that will ever be set forth in American society"; he was sure those hearing him would be interested "in our prospectus * * * that Mr. Treat will be doing."

On the drive back to New York, Nardone said he could take care of $25,000 of the $100,000 of immediately available stock that Treat had allotted him; Katz and Pinson offered to provide like amounts. Nardone asked Katz whether he could not interest friends in the $25,000 balance. Katz got $15,000 from another brother-in-law, Dr. Edward Marcus, and, under pressure from Nardone, the final $10,000 from a number of patients and friends. Pending receipt of the latter sum Amos Treat & Co. had apparently issued its own check to Delka; in any event Katz' $10,000 check to "Amos Treat & Co. as agent for Delka Research" was deposited in the brokerage house's account. Throughout these pro-

---

in contrast to the previous practice which might well have led to the filing of five appendices, each reproducing the portions of the evidence the particular party deemed favorable; we also note with interest that the parties have employed the deferred appendix procedure permitted by FRAP 30(c). On the other hand there have been many appeals this term in which the requirement of a joint appendix has been disregarded. While we have been charitable during a period when lawyers may not have been fully conversant with the Federal Rules of Appellate Procedure, we shall expect full compliance in the future, particularly in civil cases. If criminal appeals raise special problems, defense attorneys and prosecutors should bring these to our attention.

3. In fairness to the defendants we emphasize that, as indicated in the heading, the text constitutes plaintiff's version; because of the judge's ruling defendants' was never presented.

ceedings Nardone had cautioned Katz that the securities should be kept in Katz' name, as Nardone was doing with the $15,000 of his share representing investment by others. The reason was that too many names would complicate the later filing of registration statements, and Wofsey, the lawyer, "doesn't like that."

Katz became concerned over the delay in the underwriting and his lack of papers to evidence his payments but was assured by Treat and Nardone that all was well. In early December 1960, Katz received a letter from Wofsey's office which stated it was enclosing letters from the president of Delka of New Jersey and Delka of Delaware, acknowledging the receipt of $50,000 from him, the issuance of 20,000 shares of the New Jersey corporation in his name, and the exchange of these for 20,000 shares of the Delaware corporation. Katz was asked to execute an enclosed stock power for the assignment of his shares in the New Jersey corporation to the Delaware corporation.[4] The letter also stated that in view of the proposed public offering it would be necessary for the lawyer to hold the securities in escrow until the registration statement became effective. The letter said, "This is our customary procedure and conforms to the policy and requirements of the Commission." Also enclosed was a letter to the Delaware corporation which Katz signed. This stated that in consideration of the issuance of 20,000 shares of the Delaware corporation "to be held by the undersigned for investment," Katz assigned all rights to the $50,000 advance. The company's acceptance advised that Katz' shares were evidenced by Certificate No. 12, which was in the custody of Wofsey "pending processing of a Registration Statement relating to the proposed public offering of our Common Stock." When Katz called Nardone and complained that the letter "just doesn't make sense," Nardone replied that he had received the same letter and had spoken to

Wofsey and Treat; he explained "It is just customary procedure to sign it."

Several times in February 1961, Katz inquired of Treat what was happening to the registration statement. On the first occasion Treat assured him there was only "a little technical problem" about the registration, that "Everything is just coming along fine," and that he wouldn't be a bit surprised if "this stock opens up at $10 a share." At the end of the month, there were again "just little problems with the SEC," but Treat confided that Delka required money "because they need some new equipment, business is so good." Treat was having a few friends work on this. A week later Treat professed anger that his friends were being so slow and threatened that if they didn't perform promptly, he might let Katz and the latter's friends take their place. Before long, Treat was urging Katz to raise $100,000 among friends, for which he would get 50,000 or 60,000 shares. When Katz expressed surprise at the lowering of the price for the Delka bonanza, Treat said he wasn't "so sure I can get it, but I think I can swing it all right," but that Katz would have to "take care" of Nardone and that each person should pay at least $10,000.

Katz raised the money from about 20 people, who were told the certificate had to be in Katz' name. He priced the shares at figures ranging from $4 to $2.50, so that while all the funds were put up by the new investors, Katz could keep a considerable number of shares for himself. When Treat asked for the money, Katz sought assurances about the registration and was referred to Wofsey. The latter advised there were some problems and Katz had better wait a few weeks. A fortnight later, in mid-April 1961, in response to another call, Wofsey said everything had been worked out in principle and it was "just a formality of going up to some law firm and just signing the name"; he now thought it would be all right for Katz to give Treat half the money. Treat called and said he

---

4. Delka of New Jersey, the original company, was merged into Delka of Delaware in July 1961.

would send Ewbank, then president of Delka, to pick up the check. Katz gave him one for $50,000 with an endorsement "30,000 shares of Delka Research Corporation." Next day Ewbank phoned that Treat didn't want any endorsement on the check, and sent for a new $50,000 check to the order of Delka.

On Friday, April 21, Katz called on Wofsey, who inquired what he wanted to know. Katz said that Treat had told him Delka was the greatest issue he had ever underwritten and inquired whether Wofsey felt that way. The lawyer answered, "I hear it is a good one and I know it is okay." When asked about the registration, he said "it is just a perfunctory thing of getting the financial figures and putting in the accountant's reports and everything is all set." Katz then inquired whether Wofsey thought it was safe to give Treat the balance of the money. Wofsey responded that it "would help the registration" and thought "it would be all right." On the following Monday, Treat called Katz, referred to the meeting with Wofsey, and said he needed the money fast. By May 10, 1961, it was all paid and a certificate for 60,000 shares was issued that day.

Passing over the testimony of Marcus and other purchasers of Delka stock, we come to the evidence of Joseph Fleish, a partner in the accounting firm of Peat, Marwick, Mitchell & Co. Their report of the condition of Delka as of May 31, 1961, and its operations for the eleven months then ended showed a loss of $407,847. Net sales had amounted to only $28,101. The report explained that while inventories had been priced at the lower of cost or replacement market, "realization depends upon ultimate sales of the product for which no substantial market has yet been established as the greater part of the sales originally made during the eleven months ended May 31, 1961 were eventually returned." Although current liabilities substantially exceeded current assets, Delka had invested $175,000 in convertible debentures of Magna-Bond, Inc. to which Delka had granted an exclusive sales franchise, and which had a negative book value at March 31, 1961.[5]

. . Needless to say, the registration statement was never filed. On January 30, 1962, Wofsey's office wrote Katz that since the proposed public offering was no longer being considered, the continued holding of the certificates for 80,000 shares in his name was not necessary, and offered to deliver them upon receiving a receipt and release. Katz did not sign this. On December 21, 1962, Wofsey dispatched the certificates without having obtained the desired release; in his letter of transmittal he called Katz' attention to "the fact that these shares were originally issued to you for investment only."

## II. *The Claim for the Sale of Unregistered Stock*

The court's dismissal of Count I of the complaint, for the sale of unregistered stock, appears to have rested on a belief that only the issuer or immediately previous owner of the shares, in this case Delka, can "offer or sell" a security, within the prohibition of § 12(1) of the Securities Act of 1933, except for the one other case provided for by § 15, namely, a person controlling the issuer or previous owner. So limited a construction does not accord with the language and the remedial purpose of the statute or with the case law. Section 2(3) instructs that "offer" shall "include every attempt or offer to dispose of, or

---

5. Appellant's brief asserts that Treat had personally guaranteed a $400,000 loan to Magna-Bond. However, the testimony is simply that "in connection with the proposed arrangement between Delka and Magna-Bond. it was necessary to raise financing and that Mr. Treat had guaranteed an obligation of Delka to some financing company" for "something about $400,000." The accountants' report on Delka disclosed a $400,000 note payable to a commercial finance company and due September 5, 1961, secured by 100,000 shares of Magna-Bond common stock owned by Delka.

solicitation of an offer to buy, a security or interest in a security, for value." While it is conceded on appeal that at least some of the appellees could fall within the prohibition of § 12(1) if Amos Treat & Co. acted as broker for Delka, the contention is that the firm did not do this since it received no commission and was simply helping Katz to get in on a good thing. We think a jury could have permissibly concluded that the Treat firm was acting as a broker for Delka despite the absence of a commission, particularly in light of Treat's interest in the underwriting. Moreover under the statutory definition the firm would equally be liable if the jury found, as it could, that Treat & Co. actively solicited Katz' offers to buy. See Murphy v. Cady, 30 F.Supp. 466, 469 (D.Me.1939), aff'd without consideration of the point, 113 F.2d 988 (1 Cir.), cert. denied, 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940); Boehm v. Granger, 181 Misc. 680, 42 N.Y.S.2d 246 (Sup.Ct.N.Y.Co.1943), aff'd, 268 App. Div. 855, 50 N.Y.S.2d 845 (1st Dept. 1944); 3 Loss, Securities Regulation 1713–15 (2d ed. 1961). Contrast Newberg v. American Dryer Corp., 195 F. Supp. 345, 355–356 (E.D.Pa.1961). So far as this ground of decision was concerned, it was thus clear error for the court to have dismissed the complaint against Amos Treat & Co., Amos Treat and Nardone, all of whom, on Katz' testimony, pressed him to buy Delka stock.

■ There was also sufficient evidence that a jury could come to a similar conclusion with respect to Wofsey at least with respect to the second block of 60,000 shares. To be sure there was no testimony that he had taken the initiative. On the other hand the evidence clearly warranted the inference that on both occasions in April 1961, he had not simply answered Katz' questions, but had placed Treat in a position to tackle Katz for the money. Taking into account the broad language of § 2(3) and the reme-dial purpose of § 12(1), we think a jury could properly decide that Wofsey had been a party to a solicitation. Contrast Nicewarner v. Bleavins, 244 F.Supp. 261, 266 (D.Colo.1965).

■■ We take a different view with respect to Earley and Ewbank. Earley had no connection with Delka until November 1960. He then became chairman of the board of directors of the New Jersey and Delaware corporations, and later president of the latter. Ewbank was elected president and a director of the two corporations in March 1961. Obviously neither was involved in the sale of the initial 20,000 shares. There is no evidence that Earley had anything to do with the sale of the second 60,000 shares or even knew of it. The sole evidence with respect to Ewbank was what we have already recited, plus the fact that he signed the stock certificate for the 60,000 shares. We do not think § 12(1) was intended to embrace a corporate officer or director merely because he has knowledge of a sale of unregistered stock and plays such a minor role in facilitating it. We thus affirm the dismissal of the first count with respect to Earley and Ewbank.[6]

■ Appellees' second line of defense is that the sales to Katz come within the exemption of § 4(2) for "transactions by an issuer not involving any public offering." The purpose of the exemption was to exclude from the registration requirement transactions "where there is no practical need for its application or where the public benefits are too remote." H.R.Rep. No. 85, 73d Cong., 1st Sess. 5 (1933). The Supreme Court has instructed that the applicability of the exemption "should turn on whether the particular class of persons affected need the protection of the Act." SEC v. Ralston Purina Co., 346 U.S. 119, 125, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953). A decade ago we indicated disenchantment with the notion, then rather commonly

---

6. Further references to "appellees" should be read as excluding Farley and Ewbank, unless otherwise stated.

held, that sales to not more than a small number of purchasers, notably the magic figure of twenty-five, necessarily came within the exemption. Gilligan, Will & Co. v. SEC, 267 F.2d 461, 467 (2 Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). We need not decide whether sales to Katz, Pinson, and Nardone alone might have qualified. The jury could conclude appellees understood that half of Katz' initial $50,000 investment, $15,000 of Nardone's and part or all of Katz' second $100,000 purchase were to come from persons who would know nothing of Delka save what Katz or Nardone told them. This was very far from the kind of information that registration would disclose. SEC v. Ralston Purina Co., *supra*, 346 U.S. at 127, 73 S.Ct. 981. The known fact that Katz was not the sole purchaser of the initial 20,000 shares was not obliterated by his signing a letter in which Wofsey had inserted a statement that these were to be held by him for investment. Of equally little significance is Wofsey's reminder of December 21, 1962, long after the roof had fallen, that all the shares had originally been issued to Katz "for investment only." Indeed it is questionable whether these statements would suffice to prevent a jury's finding that appellees knew Katz never intended to hold even his own shares once the stock had "zoomed." See 1 Loss, Securities Regulation 665–73 (2d ed. 1961). To the contrary, appellees' clumsy and largely unsuccessful efforts to keep down the number of purchasers without the slightest regard to the critical point of the latter's knowledge of the facts, and their concealment of the truth by registering all the certificates in the names of Katz and Nardone, point to an intention to deceive the SEC in connection with the proposed registration statement rather than to an honest attempt to stay within the exemption.

Appellees' third point is that if § 12(1) is applicable, Katz himself violated it in connection with the $100,000 transaction since he became an "underwriter" or "dealer," §§ 2(11)–(12), and thereby lost the exemption conferred by § 4(1). While this may well be true, the case is not one where Katz so made himself a part of the basic violation that recovery should be denied on the basis of *in pari delicto*. See Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10 Cir. 1964); contrast Athas v. Day, 186 F.Supp. 385 (D.Colo.1960). Rather it would be the duty of the court to see to it that Katz holds an appropriate part of any recovery in constructive trust for the true owners.

The only argument in support of the dismissal of the § 12(1) count deserving serious consideration is the contention, not reached by the district judge, that Katz' claim was barred by the requirement of § 13 that an action to enforce a liability created under § 12(1) be "brought within one year after the violation upon which it is based." Appellees say the sales to Katz were completed by May 1961, yet the action was not brought until January 29, 1963.

Katz makes three answers: (1) that the stock was not truly sold until it was delivered out of escrow since he could not make an effective disposition of it; (2) that use of the mails to deliver an unregistered security is itself a violation, § 5(a) (2); and (3) that appellees are estopped by their conduct from claiming that the period of limitation began running against Katz before January 30, 1962. While we are not greatly impressed by the first two answers, for reasons indicated in the margin,[7] we are not

---

7. With respect to the first argument, delivery of the certificates to Wofsey was sufficient to pass title to Katz, N.Y. U.C.C. §§ 8–301, 8–313, although Katz could have delivered to a purchaser nothing more than an assignment of his interest in the certificates; also since the claim against appellees is for offering rather than selling, the date when Katz acquired full dominion over the stock is scarcely relevant. The latter point also bears on the second argument. Moreover, as to this we are not convinced that Katz has satisfactorily distinguished the cases, Carroll v. United States, 326 F.2d 72, 85–86 (9 Cir. 1964); Athas v. Day, 186 F.Supp. 385, 388 (D.Colo.1960), holding, to be sure in more normal situa-

required to pass upon them since we hold the third to be sufficient to avoid dismissal on the present record.

In Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 232–234, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959), Mr. Justice Black said that the ancient principle that no man can take advantage of his own wrong "has frequently been employed to bar inequitable reliance on statutes of limitations."[8] The case for doing this is particularly strong with a statute of limitations so short as § 13. Katz had no reason to avail himself of his rights under § 12(1) so long as defendants were assuring him that Delka was a viable enterprise, with a substantial underwriting just around the corner.[9] Wofsey, acting on behalf of Amos Treat & Co. and Treat personally, had assured Katz in April 1961 that registration was going forward, and that representation can be regarded as continuing until withdrawn. Although the record is curiously silent about later inquiries by the not generally quiet Dr. Katz, Marcus testified that as late as July or August 1961 he talked with Nardone and also with Treat, who told him, in Treat's words, "that the issue was at the SEC; that it would come out momentarily and I shouldn't worry about it." So far as the present record goes, the first information to Katz that the proposed public offering was no longer being considered was the letter from Wofsey's office dated January 30, 1962. It will be open to defendants on a retrial to show that Katz knew or should have known this earlier.

### III. *The Fraud Claims*

Counts II–VI of the complaint, predicated on §§ 12(2) and 17(a) of the 1933 Act, § 10(b) of the 1934 Act, and the common law, alleged a number of misrepresentations. Among these were that Delka had successfully developed a commercial polyethylene-urethane product; that it had substantial orders on hand for the product and was filling and shipping them; that it was supplying an existent commercial market and that great demand existed for Delka products; and that SEC registration of the shares to be underwritten by Treat was substantially completed and there remained only the formal signing by officers of Delka. Except with respect to Earley and Ewbank, we think plaintiff made a case sufficient for submission to the jury that statements approximating one or more of these were made or adopted by or on behalf of each of appellees, who knew or ought to have known of their falsity. We hold also that the jury could have found fraud in Treat's alleged statements of February 1961, that "Everything is just coming along fine" and that he wouldn't be surprised if the stock opened at $10 a share, cf. United States v. Ross, 321 F.2d 61, 65–66 (2 Cir. 1963); SEC v. R. A. Holman & Co., Inc., 366 F.2d 456, 458 (2 Cir. 1966), and that Delka needed new equipment because business was so good. This was well along in the period covered by the later Peat, Marwick report, and Treat, as prospective underwriter and current financier of Delka, could be inferred to have been aware of what was going on. While the cross-examination showed that Katz had taken an active interest in Delka after his initial investment, the evidence was not such as to compel a negative finding on the issue of reliance. Cf.

---

tions, that delay in mailing the certificates does not extend the period of limitation. That mailing can provide an element necessary to the application of federal power when none had existed before, Schillner v. H. Vaughan Clarke & Co., 134 F.2d 875 (2 Cir. 1943); MacClain v. Bules, 275 F.2d 431, 433–434 (8 Cir. 1960), is scarcely relevant.

8. Note also Professor Dawson's statement, "Among all the spheres of its activity estoppel probably performs no more useful service than in the alleviation of hardships caused by statutes of limitation." Estoppel and Statutes of Limitation, 34 Mich.L.Rev. 1 (1935).

9. See *id.* at 15–19.

Can-Am Petroleum Co. v. Beck, *supra*, 331 F.2d 371.[10]

The dismissal of the fraud counts came after a colloquy or, more accurately, a rather heated argument between the court and plaintiff's trial counsel. The court kept pressing for details of the misrepresentations relied upon and was dissatisfied with counsel's answers. It then declared a long recess over the lunch hour and instructed counsel that he would have to "go through every single element of fraud, the five ordinary elements of fraud," with respect to each defendant. Things went no better after the recess. Counsel apparently had an unhappy faculty of picking the weakest rather than the strongest elements of his case, and we can somewhat understand the judge's impatience, although his acerbic comments scarcely promoted counsel's composure. Since we are satisfied that the proof warranted submission of the fraud counts to the jury, we will not sustain their dismissal because of an inadequate performance by trial counsel under such circumstances.

## IV. *The Cross-Appeal With Respect to Denial of Defendants' Expenses*

After obtaining dismissal of the complaint, defendants moved, under § 11 (e) of the 1933 Act, for an order reimbursing them for the reasonable expenses incurred.[11] The statutory standard governing such an application is whether "the court believes the suit * * * to have been without merit." Although reiterating his dim view of plaintiff's case, the judge denied the motion since he considered the statute, properly in our view, to require the showing of a claim not simply lacking in merit but "bordering on frivolity." Can-Am Petroleum Co. v. Beck, *supra*, 331 F.2d at 374.

While our reversal of the dismissal with respect to Amos Treat & Co., Treat, Nardone and Wofsey necessarily deprives them of any ground for recovering expenses at this time, the question with respect to Earley and Ewbank remains. The issue is a close one, indeed razor close. We think we can distinguish between cases that are frivolous and others that are simply unmeritorious, but we confess considerable lack of confidence in our ability to apply the test of "bordering on" frivolity. Although the record is barren of evidence concerning Earley, plaintiff submitted an affidavit and letter to the district judge indicating that Delka's chief chemist, whom he had intended to call as a witness but who died before the trial, would have testified about various meetings attended by Earley where the illegal sale of Delka stock was discussed. And Katz' contact with Ewbank may have led him to believe the latter had more to do with the sale of the 60,000 shares than the evidence established. Relief under § 11(e) is discretionary, and we cannot quite say that by denying it with respect to Earley and Ewbank, the judge abused his discretion.

On Katz' appeal, the judgment of dismissal is affirmed with respect to Earley and Ewbank, with costs to them, and is reversed with respect to the other appellees, with costs to abide the event. On the cross-appeal, the order denying reimbursement of expenses is affirmed, with costs to Katz.

---

10. It is unnecessary to consider the application of the provision of § 13 of the 1933 Act forbidding maintenance of an action to enforce any liability under § 12 (2) "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." Apart from relevant factual issues, plaintiff's claims can rest on § 17(a) of the 1933 or § 10(b) of the 1934 Act or on common law (under the pendent jurisdiction principle) where this short statute of limitations does not apply.

11. Such relief would be limited to so much of the complaint as asserted claims under the 1933 Act. Donlon Industries, Inc. v. Forte, 402 F.2d 935, 936 n. 2 (2 Cir. 1968).