**Harry LEWIS, Plaintiff,**

v.

**James J. LING et al., Defendants.**

**No. 68 Civ. 4791–LFM.**

United States District Court,
S. D. New York.

Jan. 10, 1973.

---

**72.** Plaintiff has not demanded a hearing; nor does his reply, a general denial, suffice to put his misconduct in issue.

Garwin & Bronzaft, New York City, for plaintiff; Sidney L. Garwin and Bertram Bronzaft, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendants James J. Ling, W. P. Thayer and James O. Weldon; Robert B. Fiske, Jr., Arthur F. Golden and Mary E. Wagner, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

This civil action, tried without jury, was brought derivatively by plaintiff on behalf of Ling-Temco-Vought, Inc. ("LTV") against James O. Weldon, W. P. Thayer, and James J. Ling, all past

or present directors or officers of LTV.[1] Plaintiff seeks damages for sales of stock from LTV to defendants pursuant to an option plan. He alleges that the sales were fraudulent and in violation of (1) the option plan, (2) defendants' fiduciary duty to LTV, and (3) Sections 10(b) and 14(a) of the Securities Exchange Act and rules promulgated thereunder. Defendants deny any fraud or violation of law and assert several affirmative defenses.[2]

It is undisputed that under a stock option plan adopted by LTV in January 1957, options to purchase stock were granted to Ling, Thayer and Weldon, among others. All three exercised their options in 1965 and 1966, and nine, sixteen and twenty-four months thereafter Ling, Thayer and Weldon, respectively, sold some of their option shares.

All six of plaintiff's claims rest upon the single premise that the option stock was not acquired for investment.[3] All the claims must fail, therefore, if defendants did acquire their option stock for investment. The relevant language in the option agreement referring to acquisition for investment is:

"I hereby represent and warrant to . . . [LTV] that I am acquiring the shares for my own account for investment. . . . I have no present intention of selling or otherwise disposing of such shares. . . . I do not now intend to sell or otherwise dispose of . . . said shares . . . until I determine . . . that changed circumstances not now contemplated make such . . . disposition advisable. . . ." (Hereafter referred to collectively as "acquisition for investment.")[4]

Plaintiff would interpret acquisition for investment as an intent to hold stock for at least two years and perhaps much

---

1. Certain other individuals were named in the complaint as defendants but were never served with process and have not appeared in the action. They are, therefore, not considered in this opinion.

2. Besides defendants' claim that they had the proper investment intent when they purchased their stock and, thus, did not sell it in violation of the investment agreement, they also raise two defenses in their answer and numerous points in their brief. Because of our findings on the merits, we do not consider the other defenses and points raised by defendants.

3. The contract claim asserts that defendants' sales of the option stock violated their agreement with LTV to acquire the stock for investment. The breach of fiduciary claim alleges that defendants violated their fiduciary duty to LTV by not adhering to their option agreements to acquire stock for investment. The fraud claim is that defendants signed the option agreements without disclosing that they had no intention to acquire the stock for investment. The Section 10(b) claim is that defendants bought the option stock from LTV without revealing their intentions not to acquire the stock for investment.

There are two claimed violations of Section 14(a). First, defendants failed to reveal their intent not to acquire the stock for investment in the proxy statement issued to the stockholders voting on the adoption of the plan and its amendments. Second, after defendants sold their stock, they did not notify the stockholders that the sales were in violation of the stock option plan because the stock had not been held for investment.

4. The complete investment intent clause of the option agreement states:

"I hereby represent and warrant to the Company [LTV] that I am acquiring the shares for my own account for investment; that I am not acquiring such shares with a view to dividing my participation with others or with a view to or in connection with any offering or distribution; and that I have no present intention of selling or otherwise disposing of such shares. I understand that the effect of this representation is that I do not now intend to sell or otherwise dispose of all or any part of said shares unless and until I determine at some future date that changed circumstances not now contemplated make such sale or disposition advisable, and that I do not now have in mind acquiring such shares for sale or other disposition upon the occurrence or non-occurrence of some predetermined event, such as after holding such shares for the six months capital-gains period, or for a market rise, or for sale if the market does not rise, or for a fixed or determined period in the future." (Investment Agreement.)

longer. He assumes that the controlling law is the Securities and Exchange Commission's ("SEC") interpretation of investment intent as applied to exemption from registration of a private offering of securities under the Securities Act of 1933, 15 U.S.C. § 77d(2). We need not decide that question for we find that defendants did buy their option stock for investment whether we apply the teaching of the SEC or the language of the stock option agreement.

The SEC's interpretation of investment intent during the relevant period —August 1964 to March 1967—as published in a Securities Act release was as follows:

"An important factor to be considered is whether the securities offered have come to rest in the hands of the initial informed group or whether the purchasers are merely conduits for a wider distribution. Persons who act in this capacity, whether or not engaged in the securities business, are deemed to be 'underwriters' within the meaning of Section 2(11) of the Act. . . . [A] statement by the initial purchaser, at the time of his acquisition, that the securities are taken for investment and not for distribution is necessarily self-serving and not conclusive to his actual intent. . . . The nature of the purchaser's past investment and trading practices or the character and scope of his business may be inconsistent with the purchase of large blocks of securities for investment. In particular, purchases by persons engaged in the business of buying and selling securities require careful scrutiny for the purpose of determining whether such person may be acting as an underwriter for the issuer." [6]

■ As the release shows, there are no hornbook rules for determining a bona fide investment intent in a given case;[6] rather, the key to whether stock is purchased for investment lies in consideration of the totality of circumstances in light of the object and purposes of the Securities Act.

The Act sets forth a comprehensive plan for the purpose of protecting the investing public. It, therefore, requires that before any security is offered to the public, the corporation issuing the security must file a registration statement making a full and accurate disclosure of material facts relating to the corporation's properties, its business, its management, its principal stockholders, its financial condition, and the amount and types of stock outstanding. The registration statement must be supported by certified balance sheets and profit and loss statements.

The law requires a full disclosure of material facts in order to give the public access to information essential to making a realistic appraisal of the merits of the securities offered for sale and thus exercise an informed judgment in deciding whether to buy them.

A private offering is an issue of stock to a limited number of persons who acquire the stock for investment in an arm's length transaction with the corporation issuing the stock. Such buyers are able to fend for themselves in ascertaining the basic material facts about the issuer that a registration statement would otherwise reveal. Therefore, if

---

5. SEC Securities Act Release No. 4552, November 6, 1962. *See generally* Herwitz, Business Planning 206 et seq. (1966), and Securities & Exchange Comm'n v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

6. The quagmire that has resulted from the very subjective criteria in the release has drawn much criticism, *e. g.*, 1 L. Loss, Securities Regulations 665 et seq. (2d Ed. 1961). In reaction to these problems, the SEC commissioned an investigation and report, SEC Disclosure to Investors: A Reappraisal of Federal Administrative Policies under the 1933 and 1934 Acts (1969), commonly known as the "Wheat Report." Based on recommendations in the Wheat Report, the SEC released a new set of rules changing its entire approach to investment intent. SEC Securities Act Release No. 5223, January 11, 1972.

the buyers intend to acquire the stock for investment without a present intention to redistribute the stock to the uninformed public, private offerings are exempt from registration.[7]

Almost any investor buys stock with an intent to sell it at some point in time if the price is high enough. Thus, "the fact that a buyer does resell is not conclusive that he so intended when he bought."[8] There must be some indicia that the motivation of the original sale was to evade the requirement for registration.[9]

■ In ascertaining an investment intent, therefore, the proper questions to be asked are not so much what the buyer said, but what he did. Is the avowed intention to take the stock for investment a mere guise for distribution of the stock to an uninformed public? Is the purchaser a mere conduit for public distribution despite his avowed intention to take the stock for investment?

■ Our quest for an answer to whether a purchaser has a bona fide present intention to take securities for investment and not for public distribution is directed, therefore, not to the form of the transaction but to its substance as revealed in the context of circumstances. In the absence of some evidence indicative of a present purpose to circumvent the objectives of the Securities Act by distributing stock to an uninformed public, we conclude that a bona fide present investment intent exists when stock is purchased to be held indefinitely without a present intent to resell to the public forthwith, or at some fixed time,[10] or upon the happening of some fixed event in the future.[11]

We turn, now, to an analysis of facts developed upon the trial.

All the defendants testified that they had no intent to resell their shares when they exercised their options to buy. All the evidence corroborates their testimony; none contradicts it.

First, the relationship of each of the defendants with LTV is clearly consistent with his manifested intent to hold the option shares for investment. All the defendants were directors of LTV at the time of their acquisition of the option stock. In addition, Weldon was chairman of the board of a subsidiary of LTV; Thayer was the chief executive officer of a publicly-held company primarily owned by LTV; and Ling, the founder of LTV, was chairman of its board and its chief executive officer.

The large stake of the defendants in LTV is perfectly consistent with their purchasing stock solely for investment and inconsistent with purchasing it for resale to an uninformed public. No evidence was presented connecting any defendant with the business of buying and selling securities. Rather, all the evidence indicated that men in high positions and with a significant stake in the success of the enterprise desired to in-

---

7. *See* Securities Exchange Act of 1933, § 2(11), 15 U.S.C. § 77b(11). In Securities & Exchange Comm'n v. Ralston Purina Co., *supra*, the Supreme Court states:

"The design of the statute [Securities Act of 1933] is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions. The natural way to interpret the private offering exemption is in light of the statutory purpose . . . . [Thus] [a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.' " 346 U.S. at 124–125, 73 S.Ct. at 984.

Gilligan, Will & Co. v. Securities & Exchange Comm'n, 267 F.2d 461 (2d Cir. 1959).

8. 1 L. Loss, Securities Regulations 666 (2d Ed. 1961).

9. *See* Securities & Exchange Comm'n v. North American R. & D. Corp., 424 F. 2d 63, 71 (2d Cir. 1970) ; Katz v. Amos Treat & Co., 411 F.2d 1046, 1054 (2d Cir. 1969).

10. SEC Securities Act Release No. 4552, November 6, 1962.

11. *E. g.*, Gilligan, Will & Co. v. Securities & Exchange Comm'n, *supra*. *See also* United States v. Crosby, 294 F.2d 928 (2d Cir. 1961), and charge of the court below.

crease their ownership in the corporation.

Second, there is no indication of any purpose to evade or circumvent the Securities Act. All the stock of LTV was registered. The only reason that agreements of investment intent were employed was because it was thought that the most recent prospectus may have been too stale. Thus, contrary to any indicia of evasion of the securities law, the evidence indicates a double effort to comply with it.

Third, the trading practices of the defendants in general and the circumstances around the sales of their option stock in particular all indicate an investment intent. All defendants testified that they held substantial amounts of LTV stock over long periods of time and that peculiar exigencies arose that caused them to sell their option stock.

Weldon, who held his option stock for more than two years,[12] sold less than one-third of it on the advice of his financial advisor because he had 70% of his capital in 23,900 shares of LTV, 14,800 of which were acquired on the market, and 9,100 of which were option shares. Weldon then sold 16,500 shares, only 2,700 of which were option shares. He continued to hold LTV and has acquired shares since then to bring his total holdings to 21,540 shares.

Weldon's responsible position in LTV, the two-year holding period, the sale of only one-third of his option shares, and the financial advice he received lead us to conclude that Weldon did not purchase the option stock with a secret intent to resell it or to be a mere conduit for sale of the stock to the public. Rather, we conclude that he bought it to hold indefinitely; after significant time had passed, he simply felt a need to restructure his investments.

Thayer exercised his option four times from August 1964 to March 30, 1965 to purchase a total of 4,606 shares, including 3,873 shares on March 29 and 30, 1965. On July 18, 1966, in order to pay a gambling debt incurred that month, Thayer sold 400 option shares which he had acquired nearly sixteen months earlier. On January 18, 1967, he sold 2,000 more option shares acquired nearly twenty-two months earlier in March 1965. He made the sale in order to reduce a bank loan not connected with or related to the acquisition of the option shares.

Thayer's responsible position with LTV, the sixteen-month holding period, and the sale of only one-half of his option stock, for reasons not related to the performance of LTV or to other market conditions but only to personal affairs, lead us to conclude that Thayer had pur-

---

12. The duration that shares have been held is always recognized as relevant to investment intent. Authorities have suggested presumptions of investment intent arising from holding shares any time from one to five years. Comment, How Long Must I Hold?, 25 U.Miami L.Rev. 173 (1970). Because of the uncertainty in the area, we believe that it is best to treat the time that shares are held as part of evaluating the trading practices in general and circumstances of the particular sale in question rather than searching for one arbitrary line or another.

In 1971, the SEC refused to issue "no action" letters in two proposed sales of stock purchased under the private issue exemption solely because the stock had not been held for a sufficienly long time. Pakco Companies, Inc., CCH Fed.Sec.L. Rep. [1970–71 Transfer Binder] ¶ 78,117, March 30, 1971; Taylor Devices, Inc., CCII Fed.Sec.L.Rep. [1970–71 Transfer Binder] ¶ 77,981, January 11, 1971. We could find no such similar refusals in the time the option shares were acquired to when they were sold. The 1971 refusals of "no action" letters perhaps foreshadowed the SEC's movement to objective standards recommended by the Wheat Report. In any event, the usage of time alone to determine the investment intent is inconsistent with SEC Securities Act Release No. 4552, November 6, 1962, and Securities & Exchange Comm'n v. Ralston Purina Co., supra, the two leading authorities and all the cases following them. See, Comment, How Long Must I Hold?, 25 U.Miami L.Rev. 173 (1970). We, therefore, find that the SEC's refusals of "no action" letters in 1971 to be irrelevant to an interpretation of investment intent from August 1964 to March 1967.

chased his option shares for investment and, thus, did not sell them in violation of the option agreement or the securities laws. Rather, bad luck and a shortage of cash generally forced Thayer to reduce what he had considered to be his investment in LTV.

Ling exercised his option twice, on June 16, 1965 to purchase 17,000 shares, and on May 18, 1966 to purchase 8,500 shares, for a total of 25,500 shares. During the period February 24, 1967 to March 1, 1967, Ling sold all of his option stock which he had purchased nine months before, as well as 11,000 shares which he had purchased twenty months earlier. He made no profit on the sales but did recoup his investment. He needed to pay unexpected taxes (35% of the proceeds) and reduce personal obligations not connected with or related to the purchase of the shares (65% of the proceeds). After the sales, Ling was still the beneficial owner of 280,000 shares of LTV.

Ling's position as chief executive officer of LTV, the twenty-month holding period for most of the stock, his continued ownership of 280,000 shares of LTV, the personal and unexpected nature of the tax debt, the lack of connection between the loan and the acquisition of the stock, and the absence of profits on the sales outweigh any inference of acquisition for resale that might otherwise arise from the relatively short nine-month holding period for the minority of the stock. We conclude, therefore, that Ling originally exercised his option with an intent to invest, not to resell at some fixed time or upon some fixed event in the future.

Finally, there has not been one shred of evidence to indicate any intention of any defendant contrary to that of acquisition of the option stock for investment. The reasons for the sales by the defendants were not contradicted by facts or testimony of any witness.[13] There is no evidence whatever to indicate that any defendant was a mere conduit for distribution of the stock to the public.

The specific language of the contract, on its face, gives defendants an even stronger case. Each promise of intent not to sell is conditioned with words like "present" and "now." The "changed circumstances" warranting a sale are to be determined by the discretion of the purchaser. Finally, the option plan specifically provided that:

"Optionee shall not dispose of any stock acquired under this option until after the expiration of two years from the date of this grant and furthermore until Optionee has held such stock to be disposed of for more than six (6) months after the transfer of such stock to him by the Company."

The temporal language, the discretion in the purchaser as to changed circumstances, and the specific reference to a six-month limitation on sale after receipt of the stock all indicate as a matter of contract law that the option agreement envisioned that the option stock could be sold six months after it was purchased.

Thus, under the SEC's interpretation of acquisition for investment or the language and intent of the contract, we find that defendants purchased their stock with an intention to hold it as an investment and, thus, sold it without violating the option agreement or the securities laws. Since all six claims are resolved against plaintiff by the finding of an investment intent and the consequent legal sale,[14] judgment must be entered for defendants.

13. The only contrary evidence that plaintiff presented was the large income of the defendants. He wished to imply that they had sufficient monies to meet their supposed exigencies. The evidence, however, consisted solely of defendants' compensation from LTV. No evidence of defendants' entire financial picture was presented. The compensation alone is not probative of lack of need to sell stock to raise monies to meet certain financial problems. There is, therefore, not even sufficient evidence to provide an inference that defendants lacked an investment intent when they purchased the option shares.

14. See n. 3, *supra.*

The foregoing opinion constitutes this court's findings of fact and conclusions of law, as required by Rule 52, Fed.R. Civ.P.

Accordingly, we find that defendants are not liable to plaintiff on any of the claims alleged and grant judgment for defendants dismissing the action with cost.

Settle an order and judgment within fifteen (15) days from the filing of this opinion.