515 F.2d 591
 Fed. Sec. L. Rep. P 95,223
Shirley WOOLF and Robert Milberg, Plaintiffs-Appellants,
v.
S. D. COHN & COMPANY and Sidney D. Cohn,
Defendants-Third-Party Plaintiffs-Appellees,
v.
FIBERGLASS RESOURCES CORPORATION, Third-Party Defendant.
Shirley WOOLF et al., Plaintiffs-Appellants,
v.
S. D. COHN & COMPANY et al., Defendants-Third-Party
Plaintiffs-Appellees,
v.
FIBERGLASS RESOURCES CORPORATION, Third-Party Defendant-Appellee.
 Nos. 73-4044, 74-2449.
 United States Court of Appeals,
Fifth Circuit.
 July 3, 1975.
 
 Lewis W. Miles, II, Richard E. Reckson, Miami, Fla., for plaintiffs-appellants.
 Aaron S. Podhurst, Robert Orseck, Miami, Fla., for defendants-third party plaintiffs-appellees.
 Terrence J. Russell, Ft. Lauderdale, Fla., for Fiberglass Resources.
 Appeals from the United States District Court for the Southern District of Florida.
 Before RIVES, WISDOM and COLEMAN, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 The plaintiffs-appellants, Shirley Woolf and Robert Milberg, brought this action under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970)[1], and rule 10b-5, 17 C.F.R. § 240.10b-5 (1974)[2], against S. D. Cohn & Co., a partnership registered as a broker-dealer under the Securities Exchange Act, and S. D. Cohn, a general partner in that company. The appellants sought to recover the balance of the purchase price they had paid for certain convertible debentures of the Fiberglass Resources Corporation which they had subsequently converted into shares of common stock in that corporation and later sold to another major shareholder or to the issuer. They contend that they were induced to participate in the "private placement" of the debentures which were not registered under the Securities Act of 1933, 15 U.S.C. § 77a et seq., by certain material misrepresentations or omissions to state material facts on the part of Cohn and S. D. Cohn & Co. in violation of rule 10b-5.
 
 
 2
 The defendants filed a "counterclaim" charging that the plaintiffs had concealed from the issuer and from the defendants that they were purchasing the debentures for a number of individuals in addition to themselves and that Milberg was receiving a commission on at least a portion of the transaction. The defendants also filed a third party complaint against Fiberglass Resources Corporation, the issuer, predicated upon the theory that, if there were any misrepresentations or omissions of material facts regarding the sale of the debentures, these were the "sole responsibility" of Fiberglass. They say that the "totality of the representations concerning the financial condition and future prospects" of Fiberglass were "prepared and formulated exclusively by (Fiberglass) for dissemination by the defendants".
 
 
 3
 The trial court, sitting without a jury, characterized the plaintiffs as "sophisticated investors", and found that the defendants had not violated rule 10b-5. Accordingly, the district court entered judgment in favor of the defendants. We vacate that judgment and remand for further proceedings.
 
 I.
 
 4
 The predecessor of Fiberglass, a firm called Lamtex Industries, Inc., was formed in 1955. From the beginning, it specialized in the manufacture of products out of fiberglass and epoxy resins, particularly pipe, tubing, and casings of various sorts and with various commercial and military applications. The engineering expertise of Jonas Medney, president of Fiberglass, who was involved with Lamtex from its inception, played an important part in product development. In 1960, the firm "went public" with a public offering of registered securities underwritten by S. D. Cohn & Company. The offering was successful and the price of the shares offered rose from the offering price of $5 to $28. In July 1963, Koppers Company acquired Lamtex as a wholly owned subsidiary. In 1965 Koppers financed Lamtex's entry into the manufacture of reinforced plastic pipe. Many technological problems were encountered. New manufacturing equipment had to be designed and the plant had to be rebuilt. Manufacture of the product lines Lamtex had developed before its acquisition by Koppers was carried out at another plant.
 
 
 5
 In early 1968 technological difficulties incident to fully automated production of reinforced plastic pipe were, according to Mr. Medney, largely solved. Nonetheless, at that time Koppers made known its willingness to sell the pipe production facilities. (Koppers wished to retain that portion of the Lamtex subsidiary engaged in the manufacture of the original product lines, and did so.) Mr. Medney had served as president of the Lamtex subsidiary since 1965. Because of his familiarity with the development of the firm and his technological expertise, he became interested in forming a new company to purchase the facilities of the Lamtex subsidiary involved in pipe production. He approached Sidney Cohn of S. D. Cohn & Co., who had supervised the 1960 public offering of Lamtex shares. Mr. Cohn devised a "front money deal" involving the sale of debentures of the company newly formed to acquire the Koppers plastic pipe facilities, the Fiberglass Resources Corporation. He hoped to take advantage of the exemption from the registration requirements of the 1933 Act for "transactions by an issuer (of securities) not involving any public offering" afforded by § 4(2) of the Act, 15 U.S.C. § 77d(2) (1970).
 
 
 6
 Fiberglass accordingly authorized the issue of $600,000 principal amount of 61/4 percent subordinated convertible debentures. For its services in connection with the sale of the debentures, Fiberglass agreed to pay S. D. Cohn & Co. 71/2 percent of the principal amount of the debentures sold, in accordance with the debenture agreement entered into by Fiberglass and the purchasers. Mr. Cohn testified at trial, however, that he also received 10 percent of the debentures issued. He conceded that this was a larger commission than that usually charged by an underwriter, but stated that this was not uncommon in private placements with which he was familiar. He did not seek approval of this level of compensation from the National Association of Securities Dealers or any other regulatory body. Mr. Cohn further testified that he was certain that the full extent of his compensation was disclosed to the investors. He could not remember how this information had been disclosed, but he thought that it was in the debenture agreement. Examination of that document reveals disclosure only of compensation in the amount of 71/2 percent of the principal amount sold. There is no mention of an additional 10 percent participation in the debentures.
 
 
 7
 The testimony regarding the disclosure of material information respecting the Fiberglass Resources Corporation made to the offerees of these debentures is, of course, in conflict. In part, this conflict is attributable to the fact that Miss Woolf, Mr. Milberg, and Mr. Cohn had close business relations among themselves in a variety of transactions before the sale of the Fiberglass debentures, and therefore their communications regarding the Fiberglass transaction were informal. Mr. Milberg had been employed as the manager of the Miami office of S. D. Cohn & Company from March 1969 to December 1970. He had extensive first-hand knowledge of the investment business; had worked for Bache & Co.; and had worked for brokerage businesses in Miami. Mr. Cohn was often his houseguest when he visited Miami to keep in touch with the office there. Miss Woolf, an attorney who had practised in Florida for twenty-eight years, was the owner of the office building in which S. D. Cohn's office was located. She was a friend of Mr. Milberg and had made substantial investments in the stock market through the defendants in the amounts of $200,000, $150,000, and $100,000, before she purchased the Fiberglass debentures. She had had dealings with Mr. Cohn before, at least in her capacity as landlord.
 
 
 8
 Mr. Cohn testified that he informed Mr. Milberg of the investment opportunity presented by the Fiberglass debentures. All information, he said, was imparted orally. He said that he never had any direct contact with Miss Woolf, but that Mr. Milberg served as an intermediary between them. He understood at the time that Mr. Milberg was acting as an investment advisor for Miss Woolf. He conceded that he had some conversations with Miss Woolf respecting Fiberglass, but he said these took place "long after" the sale of debentures had been completed.
 
 
 9
 The plaintiffs introduced a "summary" consisting of nineteen typewritten, single-spaced pages, including a four-paragraph introductory statement, a "history" of the operations of the predecessors of the proposed Fiberglass Resources Corporation, Lamtex, and the Lamtex subsidiary of Koppers, a description of the "market" the new company hoped to serve and of the "principals" who would manage the new company, and "five year financial projections". This document was prepared by Mr. Medney and his assistant, Mr. Klimpl, at the request of Mr. Cohn. Mr. Medney testified that he revised the document to take into account suggestions and criticisms Mr. Cohn had made regarding the first draft. Mr. Cohn, however, testified that he did not intend that this "summary" be circulated to offerees of the debentures. Testimony at a deposition, introduced at trial, casts some doubt on whether this summary was circulated among prospective purchasers, for, when asked about the financial projections contained in the summary, Mr. Cohn said:"I did not believe them. I instructed all our investors not to believe them. Certainly Mr. Milberg knew better than to believe them."
 
 
 10
 There is no suggestion in the record why Mr. Cohn would request the summary and suggest changes in the draft but later conclude that the projections contained in the summary were unworthy of belief. He did testify that his firm needed a source for the representations it made to prospective purchasers, and that this was the reason he had asked Mr. Medney to prepare the statement in the first place. It was on the basis of the summary, and on eight years' acquaintance with the performance of Mr. Medney, Mr. Cohn testified, that he permitted his brokerage firm to become involved in the transaction in the first place. He did not try to obtain either for himself or for prospective investors the financial history of the Lamtex subsidiary of Koppers. He explained that those statements were probably inaccurate in that Koppers charged overhead from other operations to Lamtex, and the small independent successor corporation they envisioned would in any event be able to operate at much lower overhead than the Lamtex subsidiary. Koppers was retaining some of the lines of manufacture pursued by Lamtex before its acquisition and disposing of others developed after the acquisition. Accordingly, Mr. Cohn said, he "told (prospective investors) that we were not buying the same company but a more improved (sic) one for less money." In the "history" section, the summary did reflect the fact that Koppers was retaining some of the facilities.
 
 
 11
 How much else the potential investors in Fiberglass knew and how they found it out are not clear from the record. Indeed, the record reveals very little regarding the offerees of the debentures or their number. Mr. Cohn testified that there were ten investors in the $600,000 offering, but did not say whether there had been more offerees. Although his testimony is not clear on the point, apparently Mr. Cohn imparted all the information regarding the investment opportunity in Fiberglass to the offerees orally, either in person or over the telephone. He emphatically denied sending the summary prepared by Mr. Medney to either of the plaintiffs, and counsel implied that Mr. Milberg might have obtained it himself in the course of his employment in the Miami office of S. D. Cohn & Co. When Mr. Cohn was pressed to disclose just what information he had given to the prospective investors, he said that he could not recall the specific representations. He insisted, however, that, with the exception of the financial history of the Lamtex subsidiary under Koppers' management with Mr. Medney as president of the division, S. D. Cohn & Co. disclosed to offerees "everything we knew" about the proposed transaction.
 
 
 12
 It is not clear from Mr. Cohn's testimony how much of the information contained in the summary was imparted to the offerees. Some of the representations in the summary came under scrutiny at trial, for example: the statement that "(b)ecause one of the principals in the new company was until recently the President of this Koppers subsidiary (Lamtex), the purchase of the assets (of the "fiberglass reinforced plastic pipe factory") in reality becomes the purchase of a going business"; the statement that "(w)ith $600,000 cash as seed money and suitable bank credit, the company will be profitable and self-generating"; and the statement that "a (projected) gross profit of $225,000 and net after taxes of $100,000 (for fiscal year 1968) is shown due to the Pakistan job which is a condition of the purchase of the plant." At trial it developed that the "Pakistan job" was a contract with the government of Pakistan for the manufacture of reinforced plastic pipe. Fiberglass obtained the contract. Payment was to be by a conditional letter of credit payable upon shipment of the finished goods. Fiberglass performed its part of the agreement, but payment was delayed because of a lengthy dock strike and because of the outbreak of the war between India and Pakistan.
 
 
 13
 The plaintiffs contend that the defendant represented to them that the purchase of the plant would be consummated upon the successful completion of the Pakistan contract, and not merely upon Fiberglass's receipt of the contract. Moreover, they testified that Mr. Cohn represented to them, at the time they were considering the investment, that he intended to take the company "public" at $10 a share in the near future. They testified they were not informed that the plant had been closed by Koppers and that Fiberglass would incur substantial "start-up" costs. Nor, they contended, had they been warned that the business was much more competitive than the "market" description in the summary prepared by Mr. Medney would lead one to believe, and that adequate bank financing for the venture had not been obtained. They were, they complained, given none of the history of the pipe plant under Koppers, information that, they assert, would have shown that the plant was unprofitable.
 
 
 14
 As noted, the defendants maintained that disclosure of the financial history under Koppers was of marginal relevance to the prospects of the proposed new company because of differences in overhead and in accounting techniques. Further, Mr. Cohn denied every making any statement regarding a certain date or price for taking Fiberglass "public". He said that though it was always his goal in such financings to take the company "public", the highly speculative nature of the investment precluded any representation respecting time or price. He testified that he made it a point to warn each offeree, in most instances on the telephone, that the investment was highly speculative and that the entire investment could be lost. And, on the question of start-up costs, he stated that such expenses that were incurred during the transition in ownership were to be expected. In any event, Mr. Medney testified that the plant purchased from Koppers was in fact closed from May to December of 1968, and that Mr. Cohn knew this.
 
 
 15
 Whatever their motivation, Miss Woolf and Mr. Milberg were induced to invest $100,000 in the debentures, and, at their request, the company recorded half in the ownership of each. In fact, they represented five other investors in addition to themselves, individuals who were their friends or business associates. The debenture agreement which the plaintiffs signed when they paid for the debentures contained a clause that provided:
 
 
 16
 You (purchaser) represent and warrant that (i) you are acquiring the Debentures, and the shares of Common Stock issuable upon conversion of the Debentures, for your own account for investment and not with a view to or for sale in connection with any distribution of such Debentures or Common Stock, nor with any present intention of distributing or selling the Debentures or the shares of Common Stock of the Company which may be received upon conversion of the Debentures, and (ii) no other person has any beneficial interest in, or right to acquire, the Debentures or the shares of Common Stock of the Company which may be received upon conversion of the Debentures, or any part thereof.
 
 
 17
 The plaintiffs contend that Mr. Cohn was aware of the participation of the five other investors in the $100,000 purchase, that Miss Woolf discussed the matter with him, and that he himself provided her with a form of "investment letter" or "nominee letter" and suggested she use it. That form acknowledged the receipt of the sum the investor had paid Miss Woolf, promised to pay 6 percent annual interest on that sum "when collected from Fiberglass Resources, Inc.," and stated the understanding regarding the "loan":
 
 
 18
 As you know, I have invested $50,000 in Fiberglass Resources, Inc. which is a restricted bond which has not been registered for sale to the public. These bonds were bought for investment only and not with a view to resale. When, as and if I am legally permitted to do so I shall deliver to you in payment of said loan an amount of said debentures or the shares into which they are convertible, the amount of which shall be equal to the amount of the loan which you made to me, which you agree to accept in full payment of the loan.
 
 
 19
 The maker of the loan signed a statement at the end of the "investment letter" saying that "I have read the above and agree with its contents," and returned a copy to Miss Woolf.
 
 
 20
 Mr. Cohn, on the other hand, denied any knowledge of the involvement of five investors in addition to Miss Woolf and Mr. Milberg, and stated that he never supplied Miss Woolf with the form of "investment letter."
 
 
 21
 Once the investment was made, and the plant acquired from Koppers, economic reality overtook Fiberglass. In addition to the dock strike and the war in Pakistan, the domestic demand for Fiberglass's products was not what had been anticipated, and by March of 1969 it was clear the company would have to obtain further bank credit to survive. The holders of the debentures, including the plaintiffs, were requested by Mr. Cohn, who at the time was also a director of Fiberglass, to convert their debentures into shares of common stock. This would, of course, improve the capital structure of the company from the point of view of the lender but, theoretically at least, weaken the interest of the former debenture holders. The plaintiffs testified that again Mr. Cohn made representations respecting an impending public offering of Fiberglass that would be facilitated by the change in capital structure, thereby inducing them to convert their debentures. Mr. Cohn denied making such statements.
 
 
 22
 Finally, the company was again seeking further credit from the Chemical Bank in August of 1971 when the plaintiffs sold their shares to Mr. Medney's father or to the corporation directly (the record is not clear on the point). Management had called a special meeting of shareholders, apparently to approve certain actions necessary to complete the loan transaction. The plaintiffs wrote a letter to Mr. Medney stating that in fact they were the nominees for twenty-two Florida residents and had been since the date of purchase. They further asserted that "(t)he reason these stocks were put in our names, rather than in the true owners' name was because Mr. Sidney D. Cohn so instructed us to avoid the possibility of this being a public offering," and that "upon calling the various investors and advising them of the impending stockholders' meeting they evidenced great discontent and informed us that they intended to communicate with the Chemical Bank directly." Mr. Medney, his father, and Fiberglass's counsel proceeded immediately to Miami to meet with the plaintiffs. In the course of the meeting, Mr. Medney's father urged them to hold their securities, but stated that he or the company would buy them out for $35,000 if that was what they wanted. It was. Mr. Medney testified that at the time he thought that the representations in the plaintiffs' letter were true and that if they were communicated to Chemical Bank the loan would not be forthcoming. It should be noted that the representations, if communicated to the bank, might have impeded the loan negotiations whether or not they were true.
 
 
 23
 During the meeting, the plaintiffs were given copies of the company's audited financial reports from its inception and through June 30, 1971, and signed a statement to that effect. They then instituted the present suit against the defendants to recover the balance of the $100,000 purchase price. Mr. Medney and Mr. Cohn testified that, at the time of trial, Fiberglass was in relatively good financial condition and that they anticipated a public offering of shares if that condition continued to improve.
 
 
 24
 The trial court found no violation of the securities acts in any of the defendants' actions. It found, however, that, even if the defendants had violated the law, the misrepresentations made by the plaintiffs regarding the number of beneficial owners of the shares, both in the debenture agreement and in the letter that precipitated the August 1971 meeting, put them in pari delicto with the defendants.
 
 II.
 
 25
 We turn first to the question whether the plaintiffs' conduct put them in pari delicto[3] with the defendants, assuming the plaintiffs' allegations to be true. The origin of the doctrine of in pari delicto is described in Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293. In that suit for patent infringement, it was argued that the prior misconduct of a patentee was unrelated to the question of the validity of a patent obtained later. The Court disagreed on the facts, but it did agree with the petitioners that not every transgression committed by a suitor in equity bars his suit under the doctrine of in pari delicto. Suit would be barred, in the discretion of the court, "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." 290 U.S. at 245, 54 S.Ct. at 147.
 
 
 26
 Only recently, however, has the Court dealt with the interplay of common law equitable defenses and comprehensive federal regulatory schemes such as that embodied in the federal securities acts. In the antitrust area, the Court held in Kiefer-Stewart Co. v. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, that proof that a private suitor had engaged in an unrelated conspiracy to commit some other antitrust violation would not bar recovery in his treble damage action. Later, in Perma Life Mufflers Inc. v. International Parts Corp., 1968, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982, the Court said:
 
 
 27
 . . . we cannot accept the . . . idea that courts have power to undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others. . . . We therefore hold that the doctrine of in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action. . . . We need not decide, however, whether . . . truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of in pari delicto, for barring a plaintiff's cause of action . . . .
 
 
 28
 392 U.S. at 139-140, 88 S.Ct. at 1984. The Court in Perma Life was concerned lest a broad doctrine of judge-made law frustrate a strong congressional policy favoring the private antitrust suit as an important mode of enforcing the antitrust laws.
 
 
 29
 Perhaps because a strong congressional policy favoring the private suitor asserting implied federal rights of action is less apparent under the securities laws than in other areas of statutory regulation, lower federal courts have permitted the in pari delicto defense in private actions under the securities laws. This Court expressly sanctioned the defense in Kuehnert v. Texstar Corp., 5 Cir. 1969, 412 F.2d 700. The Court characterized the plaintiff in that case as "in fact a dupe, but (one) who believes he is a tippee with a duty to disclose, and who endeavors to take wrongful advantage of his tip." 412 F.2d at 703. The plaintiff had been induced to buy Texstar stock on margin in the open market upon a tip (later shown to be false) from the president of Texstar that there were certain merger negotiations and certain secret discoveries which, when made public, would spark a dramatic rise in the price of Texstar stock.[4] We said that in cases involving trading on market information, at least, the focal inquiry in deciding to allow the in pari delicto defense is: "which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public." 412 F.2d at 704.
 
 
 30
 There is no doubt that private actions under the securities laws protect the investing public both by deterring future violations and by requiring the offenders to pay for past violations.[5] Kuehnert is consistent with the principle that the in pari delicto defense must not be used to frustrate the availability of the private suit as a means of enforcing the securities acts. This Court in Kuehnert felt that, on the facts in that case, permitting the in pari delicto defense against a plaintiff who was an active participant in the unlawful conduct would not frustrate the enforcement of the securities acts. The plaintiff there did not actually possess material inside information (the Court did not consider the market impact of Texstar's president's statements, even though false, if they had been made public), and so could not be said to have withheld anything from those from whom he purchased the stock. As the Court saw it, the investing public was not affected, and so the case involved only a dispute between private individuals equally guilty of violating the law.
 
 
 31
 More recently, in James v. DuBreuil, 5 Cir. 1974, 500 F.2d 155, this Court further considered situations in which the in pari delicto defense might properly be applied to bar a private cause of action under the securities laws. The plaintiff there complained that the defendant had fraudulently induced him to sell to the defendant certain shares of stock in Inter National Bank of Miami. The transaction here had even less effect on the investing public at large than that in Kuehnert, since this was a face-to-face transaction. A merger had been announced between Inter National and another bank. The defendant represented to the plaintiff that if the plaintiff would sell him his shares, the defendant could obtain a substantially higher price for the shares by pooling them in an "organizers' trust" and then selling them when the merger was consummated. The defendant failed to inform the plaintiff that, if the merger were consummated, the plaintiff would be entitled to appraisal rights due dissenting shareholders under federal banking law, see 12 U.S.C. § 215a(b) (d). In fact, no such "organizers' trust" existed. The plaintiff agreed to sell the shares with the understanding, reduced to writing, that he and the defendant would share equally in any profit realized on resale of the shares. Under S.E.C. Rule 133, then in force, the defendant was forbidden from making transactions in his company's stock during the period in which the merger negotiations were taking place. The rule did not apply to options to buy entered into before the limitation period prescribed by the rule. The plaintiff agreed with the defendant to enter into an option agreement and to back-date it so that it would appear that several years had elapsed between the grant of the option and the merger. This they did. After the merger, the defendant declined to divide his profit with the plaintiff. This Court noted that the plaintiffs' participation in the unlawful activity was a sine qua non for the success of the defendant's scheme. The parties' falsification of the option agreement was accomplished through the active participation of both and, with the knowledge and intent of both, was designed to circumvent the prohibition of Rule 133. This Court, citing Perma Life, held that, on these facts, "the fault of the parties being clearly mutual, simultaneous, and relatively equal", the defense of in pari delicto therefore was available.
 
 
 32
 The case before us is distinguishable from both these recent cases and bears a significant resemblance to some cases in other circuits. For example, in Can-Am Petroleum Co. v. Beck, 10 Cir. 1964, 331 F.2d 371, the issuer sought to bar a suit to recoup the purchase price paid for unregistered securities sold under misrepresentations in violation of 15 U.S.C. §§ 77e and 77l. The plaintiff had become so swept up in the promotional effort to sell the undivided interests in oil and gas leases involved that in addition to investing a substantial amount of money herself, she actively induced friends and acquaintances to do the same. The court did not think the case a proper one for the defense of in pari delicto. It noted that the plaintiff's relationship "as a pure investor became adulterated when she actively assisted in selling others but she at no time had the degree of culpability attributed to defendants . . . ." 331 F.2d at 373. The court did not speculate on what degree of involvement would be sufficient to permit the defense.
 
 
 33
 In Katz v. Amos Treat & Co., 2d Cir. 1969, 411 F.2d 1046, 1049, the plaintiff was "a dentist by profession and an operator in securities by avocation." The plaintiff had been induced to invest large amounts of money in the securities of a plastics coating company, securities that were soon to be registered and offered to the public for sale, he was told. He was encouraged to bring in his friends as investors before the stock was made available to the public and its price "zoomed." No registration statement was ever filed, no stock was ever offered to the public, and the balance sheet of the plastics company went from bad to worse. In reversing the judgment of the district court dismissing the complaint at the close of the plaintiff's case, against four of the original defendants, the Second Circuit gave no indication that the plaintiff's causes of action under § 12 of the 1933 Act and § 10 of the 1934 Act could be barred by his own unwitting participation in the scheme.
 
 
 34
 There was more evidence in the record in Katz of outrageous conduct on the part of the defendants than in the present case. In Katz, for example, we learn that prospective investors were invited to the plant where they were treated to an impressive display of activity, particularly in the shipping room for outgoing orders. While the present record contains its share of temporizing excuses for the delay in "going public," and reflects at least one visit to the Fiberglass plant that afforded some temporary reassurance to one disgruntled investor, the defendants' conduct in Katz was worse. The degree of knowledge of participation in the violations on the part of the plaintiffs seems roughly the same here and in Katz.
 
 
 35
 More generally, we think that the principles that have emerged already in this developing area make application of the in pari delicto defense inappropriate on the facts of this case. From James v. DuBreuil we have it that the fault of the parties must be "mutual, simultaneous, and relatively equal", and the plaintiff must be an active, essential, and knowing participant in the unlawful activity. Moreover, because of the two-fold purpose of the implied private rights of action that have grown up around the securities acts, deterrence of violations and compensation of those who have suffered pecuniary loss attributable to violations, the degree to which the defendant's unlawful activity affects the investing public must be given substantial weight in determining whether to permit interposition of the in pari delicto defense. Thus, even in a case where the fault of the plaintiff and defendant were relatively equal, simultaneous and mutual, the court might still reject the defense if it appeared that the defendant's unlawful activities were of a sort likely to have a substantial impact on the investing public, and the primary legal responsibility for and ability to control that impact is with the defendant.
 
 
 36
 The district court rested its finding that the plaintiffs were in pari delicto upon two separate misrepresentations made in writing by the plaintiffs. The first was in the debenture agreement they signed upon consummating their purchase of the debentures, to the effect that they were holding for investment and not with a view to distribution and that there were no other beneficial owners. The second was in the August 1971 letter to Mr. Medney stating that there were twenty-two other beneficial owners. From what we have said, it should be apparent that the latter misrepresentation could not in itself make the plaintiffs equally blameworthy with the defendants. It was wholly unrelated in time and in purpose from the alleged unlawful activity of the defendants that is the subject matter of the suit the alleged misrepresentations and failures to disclose on the part of the defendants in connection with the distribution of Fiberglass debentures. It was calculated to raise the spector of a violation of the 1933 Act attributable to the presence of an excessive number of offerees in what might otherwise qualify as a private placement under § 4(2) of the 1933 Act, and was part of a strategy of self-help the plaintiffs resorted to in order to recoup their investment once it appeared that all was not well with Fiberglass. We do not condone it, but neither do we think it can be characterized as active, knowing, simultaneous and equal participation in the primary activity that is the subject matter of the suit.
 
 
 37
 The representations the plaintiffs made by signing the debenture agreement present a more difficult problem, since they were clearly simultaneous with the alleged transgressions of the defendants. In fact, the plaintiffs testified that they were following Mr. Cohn's instructions, which would make them active and knowing participants in a course of conduct designed to make the number of offerees of the debentures appear to be smaller than it actually was. At the time of the offering, the securities bar generally regarded it as a necessary but not sufficient condition for a private placement that the securities be offered to not more than twenty-five investors, although the S.E.C. had cautioned on several occasions that it did not regard the number of offerees as controlling. See, e. g., Gilligan, Will & Co. v. S.E.C., 2d Cir. 1959, 267 F.2d 461, cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152. Here the evidence on this point was conflicting. The trial court found that Mr. Cohn did not know that the plaintiffs represented other beneficial owners. Whether Mr. Cohn knew of the other beneficial owners or not has little or no bearing on the question of the availability of the in pari delicto defense here.
 
 
 38
 The availability of the defense in this case should, rather, turn on the impact the defendants' alleged violations might have on the investing public. This seems the rationale, though not explicitly stated, of cases such as Can-Am and Katz. Those cases, like the instant case, involved the distribution of unregistered securities by issuers who hoped their activities would fall within the § 4(2) exemption from registration under the 1933 Act. As we note in Part III, it is the responsibility of the issuer and its agent or underwriter seeking the advantages of the exemption from registration to see to it that all the requirements for the private placement exemption are met. Registration is the central mechanism the framers of the securities acts chose for the protection of investors.[6] The § 4(2) exemption provided relief from the burden of registration for distributions of securities not involving "any public offering," but, in the absence, until recently, of any definitive rule by the S.E.C. on the availability of the exemption, it has been the task of the courts to attempt to set some intelligible limits upon it. Indeed, it is in this context that the private suit is particularly appropriate, because an issuer claiming the exemption does not file with the S.E.C. the detailed information required for registered securities and is not subject even to the scrutiny accorded these filings by the S.E.C. staff. The S.E.C. has issued "no-action" letters at the request of issuers seeking the exemption, but it is not known what proportion of issuers seeking the exemption filed requests for letters, nor is it clear what proportion of the requests has been granted. In its statement accompanying the promulgation of new rule 146, 17 C.F.R. § 230.146 (1975), the Commission indicated it would issue such letters in the future only infrequently and in the most compelling circumstances. See CCH Fed.Sec.L.Rep. P 2850 (1975).
 
 
 39
 Therefore, in many instances, particularly those involving relatively small distributions, the private suit is the only effective means of detecting and deterring wrongdoing on the part of issuers and their agents or underwriters who have not registered the securities being offered for sale. Accordingly, even though the plaintiffs here, as in Can-Am and Katz, had participated to some degree in facilitating the distribution by signing the debenture agreement, we hold that their conduct does not place them in pari delicto with the defendants, who, claiming the benefits of the § 4(2) exemption, have the legal duty to meet the qualifications for it.
 
 III.
 
 40
 In bringing suit to recover the balance of the purchase price paid for the debentures, the plaintiffs were seeking a relatively simple form of relief, closely analogous to rescission, a recognized remedy under 10b-5. See, e. g., Stevens v. Vowell, 10 Cir. 1965, 343 F.2d 374; Royal Air Properties, Inc. v. Smith, 9 Cir. 1962, 312 F.2d 210. The unusual aspect here is that the plaintiffs recovered roughly 35 percent of the purchase price when they sold their shares back to the company or to Mr. Medney's father (the record is unclear on the point) in 1971, three years after their purchase. This fact does not, in our view, alter their right to seek damages compatible with the rescission remedy; it does, however, raise the interesting question of the allocation of liability (if proved) between the issuer, Fiberglass, and its agents S. D. Cohn & Co. and Mr. Cohn.[7] It is unnecessary for us to reach this question in light of the disposition we make of the remaining issues.
 
 
 41
 The difficult question this case presents and, so far as our research shows, it is a novel one is the extent to which rule 10b-5 provides a remedy to a purchaser of securities against the issuer or others involved in the distribution when the issuer and its agents fail to conduct the distribution in such a manner that it qualifies for the exemption from registration provided by § 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2) (1970). The plaintiffs' theory was not well articulated before the trial court. Indeed, the appellees complain that the appellants are shifting theories on appeal. Even if that were true, the arguments presented on appeal are implicit in the facts and must be considered by this Court. See, e. g., Shumate & Co. v. National Assoc. of Sec. Dealers, 5 Cir. 1975, 509 F.2d 147 and cases there cited. We think, however, that rule 10b-5 is broad enough to afford a remedy for the wrongdoing that is alleged here.
 
 
 42
 Rule 10b-5 makes it unlawful for any person by the use of any instrumentality of interstate commerce or a national securities exchange
 
 
 43
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 44
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 45
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 46
 in connection with the purchase or sale of any security.
 
 
 47
 The rule is broad enough to comprehend most causes of action for corporate mismanagement presently available chiefly under state business corporation and fiduciary law, and more beside.[8] And, of course, federal courts would not be constrained by Erie from altering state law in the process to make it more congenial to the purposes of the federal regulatory statutes that spawned the rule.
 
 
 48
 A striking example of the trend is Superintendent of Ins. v. Bankers Life & Cas. Co., 2d Cir. 1970, 430 F.2d 355, rev'd & remanded for trial, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128, a case involving a purchase of the shares of a subsidiary and subsequent payment for the shares by the purchasers of control by misappropriating bonds in the subsidiary's own portfolio. The Court of Appeals for the Second Circuit recognized the case as a paradigm of corporate mismanagement under state law and saw no case under 10b-5. Mr. Justice Douglas, writing for the Supreme Court, disagreed: "The crux of the . . . case is that (the subsidiary being acquired) suffered an injury as a result of deceptive practices touching its sale of securities as an investor." 404 U.S. at 1273, 92 S.Ct. at 169.[9]
 
 
 49
 The most recent word on the scope of rule 10b-5 from the Supreme Court came in Affiliated Ute Citizens of the State of Utah v. United States, 1972, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741. There, Indians had deposited in a bank shares of stock in a corporation formed to manage mineral rights underlying their reservation. The bank agreed to oversee transfers of the Indians' shares and ensure that they were properly made. On advice of certain of the bank's employees, some of the Indians approved transfer of their shares to whites at substantially less than their fair value. The Court held that the plaintiffs had made out a case under 10b-5 against the bank and its employees, and clarified the necessity of showing "reliance" in a non-disclosure case:
 
 
 50
 Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.
 
 
 51
 406 U.S. at 153-54, 92 S.Ct. at 1472.
 
 
 52
 The case before us is relatively easy with respect to the applicability of 10b-5 because of the close nexus between the alleged wrongs complained of and the fairness of the public and private securities markets. The keystone of the securities acts is "disclosure". Disclosure is a prime weapon in the arsenal Congress devised for the protection of investors. But the legislation demonstrates, in its methodology if not in an express statement of purpose, a close relationship with the trading mechanisms by which transactions in securities are carried out. Indeed, it might be possible to draw a workable line of demarcation between transactions covered both by 10b-5 and state law and those properly controlled only by the latter, by reference to the effect the transaction has on the securities markets. Misappropriation of some tangible assets of a closely held corporation by a dishonest accountant, because of its limited or perhaps nonexistent impact on the securities markets, might be relegated to the traditional state law of corporate mismanagement.
 
 
 53
 A case such as the present one, on the other hand, is related to the fairness of the public and private securities markets in a double sense. First, it involves the representations incident to the creation and sale of equity securities in a new corporation, with the expectation that the shares will later be listed on a national securities exchange. Second, in addition to the truth or falsity of the representations as to the prospects of the firm, it involves the legality of the very procedure by which the securities were offered for sale, that is, whether the transaction qualified for the § 4(2) exemption. These two senses in which the public and private securities markets are involved are themselves related: one of the cardinal requirements for a § 4(2) exemption is that the investors involved have accurate information regarding the state of affairs in the corporation in which their investment is solicited. To the extent it connotes a transaction that has no effect on the securities markets, the term of art "private placement" associated with the § 4(2) exemption is inaccurate. Although issues qualifying for the exemption are excused from relatively onerous and expensive registration requirements, there remains the same high duty toward prospective investors as in a public offering, of which more later. The magnitude of transactions invoking the exemption, both in terms of their number and the aggregate amount of capital involved, underscores the importance of this sort of transaction in the overall process of capital allocation in our economy. See, e. g., Bloomenthal & Wing, Securities Law § 4.05(1)(a) (1973): "corporate private placements were approximately $8.5 billion compared to registered corporate offerings which were only in the amount of $6.5 billion in 1965." Under any view of how far 10b-5 should extend, the area of private offerings of securities under the exemption afforded by § 4(2) of the 1933 Act is so closely related to the fairness of the public and private securities markets and the allocation of investment capital that it must come within the scope of the rule. The fact that the plaintiffs sought relief under § 10(b) of the 1934 Act for alleged violations of the 1933 Act does not alter this result, for, as the Second Circuit has noted, these acts are to be construed as "a single comprehensive scheme of regulation" to avoid inconsistencies and to promote their broad remedial purposes. Globus v. Law Research Serv., Inc., 2d Cir. 1969, 418 F.2d 1276 (collecting authorities).
 
 
 54
 Saying that 10b-5 includes in its ambit alleged violations of the 1933 Act in the area of private offerings does not end our inquiry. We must now ask whether the plaintiffs made out a 10b-5 case that was much broader than the trial court thought was actionable under the rule. The trial court apparently thought that the plaintiffs' case was founded only upon certain alleged specific misrepresentations and omissions, and he found against the plaintiffs on the specifics. For example, he found that Mr. Cohn had not stated a specific time and price for "going public"; that Mr. Cohn had not said the purchase of the plant would go forward on the completion of the Pakistan contract but rather on the award of the contract. Closer to the other end of the law-fact spectrum, he found that Mr. Cohn had imparted to Mr. Milberg "all the information on Fiberglass" that Mr. Cohn "believed to be true and accurate," and that Mr. Cohn's status throughout the transactions "was that of a broker-dealer, not an underwriter."
 
 
 55
 We need not decide here the validity of the trial court's findings of fact regarding specific misrepresentations or omissions, except to note the sharp conflict in the testimony regarding virtually every one of them. For, although 10b-5 liability could have been predicated upon the specific misrepresentations and omissions, if proved, it is still open to the plaintiffs to prove a 10b-5 violation in this context based upon something broader. Assume that the defendants failed to qualify the sale of Fiberglass debentures as exempt from registration under § 4(2) of the 1933 Act, and that part of the failure was a lack of disclosure of information regarding the investment opportunity that registration would have revealed. Depending on the amount of information the defendants failed to disclose to offerees and its materiality to the transaction, we think there comes a point where the failure to disclose can be characterized as an "act, practice or course of business which operates or would operate as a fraud or deceit" upon the offerees, in violation of the third clause of the rule.[10]
 
 
 56
 The starting point in determining whether a transaction validly falls within the § 4(2) exemption is S.E.C. v. Ralston Purina Co., 1953, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494.[11] In that case, the Court stated that the "imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable." 346 U.S. at 126, 73 S.Ct. at 985. On the merits, the Court noted: "The natural way to interpret the private offering exemption is in light of the statutory purpose. Since exempt transactions are those as to which 'there is no practical need for * * * (the bill's) application,' the applicability of (§ 4(2)) should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.' " 346 U.S. at 124-25, 73 S.Ct. at 984. The Court's use of the term "class" is probably attributable to the distribution scheme involved in that case, a program instituted by a large manufacturer of food products by which unregistered shares of its common stock were offered for investment to a wide range of its employees, living in "over fifty widely separated communities" and engaged in every position from "chow loading foreman" to "veterinarian." 346 U.S. at 121, 73 S.Ct. 981. As an example of an offering that might come within the § 4(2) exemption, the Court cited an offer "made to executive personnel who because of their position have access to the same kind of information that the act would make available in the form of a registration statement." 346 U.S. at 125-26, 73 S.Ct. at 985.
 
 The Court refined its test still further:
 
 57
 (O)nce it is seen that the exemption question turns on the knowledge of the offerees, the insurer's motives, laudable though they may be, fade into irrelevance. The focus of inquiry should be on the need of the offerees for the protections afforded by registration. The employees here were not shown to have access to the kind of information which registration would disclose.
 
 
 58
 346 U.S. at 126-27, 73 S.Ct. at 985. Ralston Purina was the Court's latest treatment of the private offering problem.
 
 
 59
 That problem has often been before the other courts since Ralston Purina, however, and has engendered two important opinions in this Court. In Hill York Corp. v. American Int. Franchises, Inc., 5 Cir. 1971, 448 F.2d 680, this Court said that the availability of the exemption is peculiarly a question of fact dependent upon the circumstances of each case. The Court noted that § 5 of the 1933 Act, 15 U.S.C. § 77e (1970), made it unlawful to use an instrumentality of interstate commerce to sell or purchase a security for which no registration statement is in effect, and that § 12 of the Act, 15 U.S.C. § 77l(1) (1970), makes any person who offers or sells a security in violation of § 5 liable to his purchaser in a suit to recover the consideration paid. The Court then proceeded to consider "specific factors" relevant to whether the transaction qualifies for the exemption. We said that we should consider "the number of offerees and their relationship to each other and to the issuer", "the number of units (of the security) offered", "the size of the offering", and "the manner of offering". 448 F.2d at 688-89.
 
 
 60
 We approved the trial court's jury charge "that every offeree had to have information equivalent to that which a registration statement would disclose". 448 F.2d at 689. We rejected the contention of the defendants in Hill York that a high degree of business or legal sophistication on the part of the offerees would be enough to establish the exemption. The offerees were lawyers and businessmen, for the most part, and we observed: "(o)bviously if the (offerees) did not possess the information requisite for a registration statement, they could not bring their sophisticated knowledge of business affairs to bear in deciding whether or not to invest". 448 F.2d at 690. Moreover, we said "(t)he (offerees) do not have to prove that they could not have discovered the falsity upon reasonable investigation. . . . To put it simply, the availability of information elsewhere does not excuse misleading or incomplete statements". 448 F.2d at 696.[12]
 
 
 61
 The second important case was S. E. C. v. Continental Tobacco Co., 5 Cir. 1972, 463 F.2d 137. In that case, the S.E.C. sued for injunctive relief against Continental with respect to an offering of its securities it claimed was exempt under § 4(2). Continental was incorporated to manufacture low-tar, low-nicotine cigarets. The challenged offering involved presentations to prospective investors that were short on the kind of information registration would have revealed about the issuer, but that heavily emphasized films extolling the virtues of its cigarets, including one that played upon the nondeleterious effects, relative to competing brands, that smoking its product had upon mice. Interestingly, a number of members of the medical and health professions were recruited as investors in this manner.
 
 
 62
 This Court in Continental began its analysis with the holdings of Hill York. We refined the tests established in Hill York by focusing upon the information about Continental that each of the offerees possessed. "None of the purchasers had any actual opportunity to inspect Continental's records or to verify for themselves statements made to them as inducements for the purchases. Some of the purchasers had never met any officers of the company prior to acquiring the stock." 463 F.2d at 158. We disagreed with the district court that, because the offerees who purchased signed "investment letters" acknowledging receipt of a "prospectus" and unaudited financial statements, they should be held to have had access to all the information registration would have afforded. 463 F.2d at 160. However useful such statements might be as precautions, they cannot be, in themselves, a basis for exemption.
 
 
 63
 Indeed, this Court went further in Continental. It agreed with the S.E.C.'s position that even if the prospectus that was sent to the purchasers contained all the information registration would disclose, that fact alone would not justify the exemption. We said: "Continental did not affirmatively prove that all offerees of its securities had received both written and oral information concerning Continental, that all offerees of its securities had access to any additional information which they might have required or requested, and that all offerees of its securities had personal contacts with the officers of Continental." 463 F.2d at 160.
 
 
 64
 This portion of the opinion was subjected to much criticism. See, e. g., Goldberg, Private Placements and Restricted Securities § 2.16(a) at 2-139; Kripke, "Wrap-up," Revolution in Securities Regulation, 29 Bus.Law. (Special Issue) 185, 187 (1973). The gist of the criticism has been that Continental virtually requires that all offerees have "insider" status, if a transaction is to qualify as exempt under § 4(2). We think these fears are unfounded. The quoted language must be read in conjunction with the balance of the opinion, in which we noted that, although the record reflected that there were at least 38 offerees, 35 of whom bought stock, Continental failed to sustain its burden of proving that there were not more than the 38 offerees revealed in the evidence adduced by the S.E.C. In other words, even assuming that those investors who received the prospectus had received all the information registration would have disclosed, Continental's proof respecting the number of offerees and their relation to it was inadequate.
 
 
 65
 We should also note in this context that there is an important distinction between completing the registration process and merely making available to offerees all the information that registration would have disclosed. This distinction itself justifies our conclusion in Continental that mere disclosure of what registration would have revealed does not, without more, establish a § 4(2) exemption. Registration of securities with the S.E.C. is not a mechanistic, ministerial function, either on the part of the issuer or the S.E.C. The filings are subject to the scrutiny of the S.E.C. staff, which is empowered to take a variety of corrective measures against the issuer if the disclosure is incomplete or otherwise inadequate, and the Commission may seek disciplinary action against broker-dealers, civil relief and criminal sanctions as well. See generally Bloomenthal & Wing, Securities Law §§ 8.01 et seq. In a private offering, this scrutiny is not present,[13] and so we regard the imposition on issuers and their agents claiming the exemption of requirements, in addition to disclosure of what registration would have revealed, to be appropriate.
 
 
 66
 The additional limitations placed upon such offerings limit the number of people affected. Moreover, particularly since the S.E.C.'s adoption of Rule 146, 17 C.F.R. § 230.146 (1975)[14], and its introduction of the requirement, in certain circumstances, that the issuer ascertain that the prospective investor is capable of bearing the economic risk of the investment, the impact upon individual investors should the venture fail is diminished. Rule 146 imposes the additional requirement that, before an issuer may sell an unregistered security under its provisions, he must have reasonable grounds to believe that the investor, either on his own or with the aid of an "investment advisor", be "sophisticated", that is that he be "capable of evaluating the merits and risk of the prospective investment." This new requirement carries the analysis of Hill York and similar cases one step further. In Hill York, we said that the "sophistication" of the offerees was not enough alone to qualify; rule 146 says that "sophistication" is required but not enough. Of course, the new rule does not purport to be an exclusive definition of the circumstances under which the exemption is available indeed, it disclaims any such intent. It is probable, however, that practitioners will be unwilling to stray from the safe harbor the rule apparently affords, and it does provide a useful frame of reference to an appellate court in assessing the validity of § 4(2) exemptions claimed, like this one, prior to its effective date.
 
 
 67
 In any event, we cannot agree with those critics who read the Continental case to require that the offerees have "insider" status.[15] We read it as requiring that there be disclosure of the information registration would have revealed to each offeree, with the caveat that such disclosure is not in itself sufficient to qualify for the exemption. This is the main refinement Continental added to the test in Hill York.
 
 
 68
 Applying this test, then, to the record in this case, we have serious doubt that Fiberglass' sale of debentures qualified as exempt under § 4(2). As we indicated in Continental, boilerplate clauses in documents signed by purchasers stating that they have received full disclosure, or all the disclosure they desire, do not establish an exemption, and in the present case this applies both to the clauses in the "debenture agreement" the plaintiffs signed and the statement they signed upon selling their shares either to Mr. Medney or Fiberglass. Similarly, the trial court's finding that Mr. Cohn told Mr. Milberg all the information he had obtained about Fiberglass he believed to be true is only the beginning of the inquiry, not its conclusion. Candor is the first thing required of an agent of an issuer, but not the only thing. The issuer and its agents in a private placement must afford each offeree with the information registration would have afforded a prospective investor in a public offering. The parties' debate in the briefs over the status of S. D. Cohn & Co. and Mr. Cohn as "underwriters" misses the point. Section 5 of the 1933 Act, 15 U.S.C. § 77e (1970), makes it unlawful for any person to sell unregistered securities. Section 4(1), 15 U.S.C. § 77d(1) (1970) exempts from this prohibition "transactions of any person other than an issuer, underwriter, or dealer." There can be no question that S. D. Cohn & Co. and Mr. Cohn were "dealers" within the meaning of § 2(12), 15 U.S.C. § 77b(12) (1970):
 
 
 69
 The term "dealer" means any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person.
 
 
 70
 S. D. Cohn & Co. and Mr. Cohn are therefore prohibited from selling unregistered securities unless the offering is exempt under § 4(2).
 
 
 71
 Moreover, they would be underwriters under § 2(11), if they offered or sold for an issuer (Fiberglass) in connection with the distribution of any security. Since the S.E.C. has always taken the position that "distribution" in this context means a public offering, their status under § 2(11) again turns on whether the offering was exempt under § 4(2). See, e. g., I L. Loss, Securities Regulation 551 (2d ed. 1961). The record indicates that they were substantial shareholders in Fiberglass, and suggests that for some purposes, at least, they were under the duties imposed upon the issuer because of their possible status as "control persons." Cf. Sommer, Problems of Controlling Persons, Practicing Law Institute, First Annual Institute on Securities Regulation 105 (1970). We need not pursue this line of inquiry, however, for in our view of the case the label attached to them is of secondary importance. What matters more here is whether they violated § 5 of the 1933 Act by selling unregistered securities, and this in turn depends upon whether they and Fiberglass, the issuer, had a valid claim to the § 4(2) exemption.
 
 
 72
 The record is not clear as to what information was disclosed to whom at what time. It does not appear that S. D. Cohn & Co.'s 71/2 percent commission was disclosed until the delivery of the debenture agreement for signature, and our examination of the record does not reveal when, if ever, the additional 10% interest in the debentures was disclosed. We cannot tell whether the plan of distribution was revealed to the plaintiffs, or whether they were fully advised of the uses to which the proceeds of the debentures were to be put. It is reasonably clear that they did not receive financial statements or other information bearing on the prior performance of the predecessor corporation as they would have had the debentures been registered. See 15 C.F.R. § 239.11 (1975). Other than the information contained in the summary, which the trial court found the defendants did not send to the plaintiffs, the record does not show whether there was disclosure of the physical facilities and their suitability for the proposed enterprise.
 
 
 73
 The record does not show whether there was disclosure of the capital structure of the company, including dividend rights, pre-emptive rights, and the like important information here, because the debentures were convertible. The record does not show whether the names and backgrounds of the directors and officers, their compensation, or their options to purchase securities were revealed. We cannot tell whether there was disclosure of persons owing more than 10 percent of the issuer's stock. In short, we cannot tell from the record whether many items of information that registration would have made available to prospective investors were disclosed to the plaintiffs here. Moreover, from his own testimony, it appears that Mr. Cohn never had direct communications with Miss Woolf (although she disputes this with regard to certain aspects of the transaction). This impersonal manner of offering itself calls into question the validity of the claimed exemption. In this connection it is significant that new rule 146 places upon the issuer or his agent duty to exercise reasonable care to ascertain that the offeree is not or will not become an "underwriter" under § 2(11) and that the offeree meets the "sophistication" and "risk-bearing" requirements of the rule. The absence of any personal contact with the issuer or its agents here would tend to indicate a manner of offering more public than private, using the Hill York formulation. We cannot tell how many other offerees there were in this transaction.
 
 
 74
 On the present record, we cannot say whether the transaction here qualified as a private offering under § 4(2) of the 1933 Act. We have indicated some of the inadequacies in the record, and, on remand, the burden is on the defendants to establish the availability of the exemption. The unusual aspect of this case, however, is that even if the defendants should fail to demonstrate the availability of the exemption, the plaintiffs may fail to recover the balance of the purchase price. For the plaintiffs did not bring suit under § 12 of the 1933 Act but rather under § 10(b) of the 1934 Act and rule 10b-5. It follows that they must show that the omissions or misrepresentations of information that make the § 4(2) exemption unavailable to the defendants, in their cumulative effect, were such that a reasonable investor, had the information registration would have afforded been available, might have considered them important in the making of his investment decision. They need not show that they themselves would have relied on the information the defendants failed to disclose. Affiliated Ute Citizens of the State of Utah v. United States, 1972, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741; cf. Note, The Reliance Requirement in Private Actions Under SEC Rule 10b-5,88 Harv.L.Rev. 584. Failure to disclose material information that would have been disclosed by registration and failure to qualify for the § 4(2) exemption are not the same thing, and it may develop on remand that the exemption is unavailable even though the defendants disclosed to the plaintiffs all the information registration would have revealed.
 
 
 75
 The judgment of the district court is therefore vacated, and the cause remanded for further proceedings consistent with this opinion.
 
 
 76
 Vacated and remanded.
 
 
 
 [1]
 15 U.S.C. § 78j(b) (1970):
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 [2]
 17 C.F.R. § 240.10b-5 (1974):
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 [3]
 For recent general discussions of the in pari delicto doctrine, see Bell, How to Bar an Uninnocent Investor The Validity of Common Law Defenses to Private Actions Under the Securities Exchange Act of 1934, 23 U.Fla.L.Rev. 1 (1970); Comment, Plaintiff's Conduct as a Bar to Recovery Under the Securities Acts: In Pari Delicto, 48 Tex.L.Rev. 181 (1969); Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution, 120 U.Pa.L.Rev. 597, 659 (1972); Comment, The Demise of In Pari Delicto in Private Actions Pursuant to Regulatory Schemes, 60 Cal.L.Rev. 572 (1972); for comparison with analogous problems in the antitrust area, see Note, In Pari Delicto and Consent as Defenses in Private Antitrust Suits, 78 Harv.L.Rev. 1241 (1965); Note, Unclean Hands: The Effect of Plaintiff's Antitrust Violations in Antitrust Actions, 113 U.Pa.L.Rev. 1071 (1965)
 
 
 [4]
 The leading case in the area of trading on market information is, of course, S. E. C. v. Texas Gulf Sulphur Co., 2d Cir., 401 F.2d 833, rev'g and aff'g in part 258 F.Supp. 262 (S.D.N.Y.1966), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). For a recent study of the problems involved in this area, see Fleischer, Mundheim, & Murphy, An Initial Inquiry into the Responsibility to Disclose Market Information, 121 U.Pa.L.Rev. 798 (1973), in which many of the leading cases are reviewed. The background of the Texas Gulf Sulphur case is reviewed in Patrick, Perpetual Jeopardy: The Texas Gulf Sulphur Affair (1972)
 
 
 [5]
 It need hardly be added that the Securities Acts were not enacted only for the "long-term" or conservative investor. As the Second Circuit noted, "(t) he speculators and chartists of Wall and Bay Streets are also 'reasonable' investors entitled to the same legal protection afforded conservative traders." 401 F.2d 849
 
 
 [6]
 See, e. g., Douglas, Foreword to Symposium, 28 Geo.Wash.L.Rev. 1 (1959); Landis, The Legislative History of the Securities Act of 1933, 28 Geo.Wash.L.Rev. 29 (1959)
 
 
 [7]
 On this question, see generally Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597 (1972), where many authorities are collected
 
 
 [8]
 On the history of the rule, see Note, SEC Rule 10b-5: A Recent Profile 13 Wm. & Mary L.Rev. 860 (1972). Recent comments on the scope of the rule include Bromberg, Are There Limits to Rule 10b-5?, in Special Issue, Revolution in Securities Regulation, 29 Bus.Law. 167 (1974); Ruder & Cross, Limitations on Civil Liability Under 10b-5, 1972 Duke L.J. 1125; Bradford, Rule 10b-5: The Search for a Limiting Doctrine, 19 Buff.L.Rev. 205 (1970); Leach, Developments Rule 10b-5 and Section 16(b), in Practising Law Institute, Third Annual Institute on Securities Regulation 375 (1972). Useful recent comments of a more general nature include Cobine, Elements of Liability and Actual Damages in Rule 10b-5 Actions, 1972 U.Ill.L.F. 651; Jacobs, What is a Misleading Statement or Omission Under Rule 10b-5?, 42 Ford.L.Rev. 243 (1973)
 
 
 [9]
 The requirement that the deceptive practice "touch" the sale or purchase of securities is, of course, an elastic one, and has been criticized on that account. See Note, The Controlling Influence Standard on Rule 10b-5 Corporate Mismanagement Cases, 86 Harv.L.Rev. 1007 (1973)
 
 
 [10]
 Of course, it is also possible that such a failure to disclose could violate the first or second clauses of the rule
 
 
 [11]
 The literature on the private offering exemption under Section 4(2) is extensive. In addition to the single-volume treatise, Goldberg, Private Placements and Restricted Securities (1972), useful general accounts may be found in Jennings & Marsh, Securities Regulation 424-42 (3d Ed. 1972); Bloomenthal & Wing, Securities Law §§ 4.01 et seq. (1973); Note, Reforming the Initial Sale Requirements of the Private Placement Exemption, 86 Harv.L.Rev. 403 (1972); Meer, The Private Offering Exemption Under the Federal Securities Act A Study in Administrative and Judicial Contraction, 20 S.W.L.J. 503 (1966); Steffen, The Private Placement Exemption: What To Do About A Fortuitous Combination in Restraint Trade, 30 U.Chi.L.Rev. 211 (1963); O'Boyle, Problems of Private Placement from the Viewpoint of the Issuer, Henkel, The Investment Bankers Role in the Private Placement of Securities, Levenson, Investment Companies and the Private Placement of Securities, Sommer, Problems of Controlling Persons, Young, Brokers and Control Stock Problems, all in Practising Law Institute, First Annual Institute on Securities Regulation (1970); Schneider, Private Placements, Caplan, Blue Sky Problems in Private Placements, both in Practising Law Institute, Second Annual Institute on Securities Regulation (1971); Note, Resale of Restricted Securities Under SEC Rule 144, 81 Yale L.J. 1574 (1972); Steffen, Private Placement Should Be Registered, 43 N.C.L.Rev. 58 (1965); Rediker, The Fifth Circuit Cracks Down on Not-So-Private Offerings, 25 Ala.L.Rev. 289 (1973); Sowards, Private Placements and Secondary Transactions: The Wheat Report Proposals for Reform, 1970 Duke L.J. 515
 
 
 [12]
 This statement regarding the duty of an offeree to investigate should be compared with the Supreme Court's holding that, in an action predicated on Rule 10b-5, and involving failure to disclose material information, no specific showing of reliance on the part of the plaintiffs need be demonstrated, and that reliance would be assumed if the information withheld would have been regarded by an ordinary investor as important in the making of his investment decision. Affiliated Ute Citizens of the State of Utah v. United States, 1972, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741
 
 
 [13]
 As we noted in Part II of this opinion, the S.E.C. in the past has issued "no-action" letters at the request of issuers seeking the § 4(2) exemption. It is not known what proportion of issuers seek such no-action letters, nor is it known what proportion of those requests has been granted by the S.E.C. In any event, the S.E.C. noted, in its statement accompanying the promulgation of new Rule 146, 17 C.F.R. § 230.146 (1975), that in the future, such no-action letters would be issued infrequently and only "in the most compelling circumstances." See 1 CCH Fed.Sec.L.Rep. P 2850 (1975)
 
 
 [14]
 New Rule 146 is lengthy, and has been usefully summarized as follows in Alberg & Lybecker, New S.E.C. Rules 146 and 147: The Non-Public and Intrastate Offering Exemptions from Registration for the Sale of Securities, 74 Colum.L.Rev. 622, 633-34 (1974):
 (1) The issuer or any person acting on its behalf shall neither offer nor sell the securities by means of any form of general solicitation or advertising, including advertisements, seminars, or meetings, or any letter or other written communications, except in cases where all those invited to and attending meetings and all those receiving written communications satisfy the conditions of Paragraph (2) below.
 (2) The issuer shall have reasonable grounds to believe and shall believe:
 (a) immediately prior to making any offer, either: (i) that the offeree has "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment," or (ii) that the offeree is a person who is able to bear the economic risk of the investment"; and
 (b) immediately prior to making any sale, after making reasonable inquiry, either: (i) that the offeree has such knowledge and experience, or (ii) that the offeree and his offeree representative(s) together have such knowledge and experience and that the offeree is able to bear the economic risk of the investment.
 (3) Each offeree shall either:
 (a) have access to the same kind of information that is required by Schedule A of the 1933 Act (including financial statements, description of business, etc.); or
 (b) have furnished to him or his offeree representatives the same kind of information that is required by such Schedule A.
 (4) Each offeree or his representative shall have the opportunity to obtain any additional information necessary to verify the accuracy of any such information and to ask questions and receive answers from the issuer.
 (5) Each offeree shall be informed in writing by the issuer that he must continue to bear the economic risk of the investment for an indefinite time and that the securities cannot be sold unless they are subsequently registered or an exemption is available.
 (6) There shall be no more than thirty-five persons who purchase securities of the issuer of the same or similar class in any offering pursuant to the Rule.
 (7) The issuer shall exercise reasonable care to assure that the persons purchasing the securities from the issuer are not underwriters, including:
 (a) making a reasonable inquiry to determine if the purchaser is purchasing for his own account;
 (b) placing a legend on the certificate stating that the securities have not been registered and setting forth or referring to the restrictions on transferability;
 (c) placing stop-transfer instructions against the shares on the books of the issuer and with the transfer agent; and
 (d) obtaining from the purchaser a written agreement that the securities will not be sold without registration or under an exemption.
 The new rule does not purport to be an exclusive definition of those offerings that qualify for the § 4(2) exemption. The anti-fraud provisions of the Securities Acts, of course, apply to offerings whether or not they meet the requirements of Rule 146. Some commentators viewed the promulgation of Rule 146 as a response on the part of the S.E.C. to the holdings of this Court in the Hill York and Continental cases. See, e. g., Arthur, Rule 146 Under the Securities Act of 1933: A Significant Codification, 56 Chicago B.Rec. 94 (1974). Some members of the financial community apparently read the Continental case in particular to require that offerees have the status of "insiders" in order for the offering to qualify under § 4(2). The concern was particularly acute in the case of large institutional investors, such as banks and insurance companies, which were prohibited by state and federal law from occupying that status with respect to concerns in which they had made large investments. As we have noted, we do not read the Continental case this broadly.
 The new rule provides that the offeree must either have access to the information that registration would have disclosed, or that the issuer must furnish him or his representative that information. The new rule is more restrictive than the cases in this Circuit in that it requires that the offeree either be sophisticated or advised by an offeree representative who is, in addition to the requirement that offerees receive or have access to information that registration would disclose. Moreover, the requirement that the offerees be able to bear the economic risk of the investment is one that our cases never dealt with. In addition to the vagueness of this requirement, it is remarkable that no consideration is given to the actual risk of the investment opportunity. Presumably this element in the investment decision is subsumed in the rules disclosure requirements; a sophisticated and well-heeled investor should, presumably, be able to assess the risk of the investment himself. It should be noted that the new Rule 146 does not require the issuer to report any information regarding the offer sought to be exempted under § 4(2) to the S.E.C.
 For a recent explication of new rule 146, see Kinderman, The Private Offering Exemption: An Examination of its Availability Under and Outside Rule 146, 30 Bus.Law 921 (1975).
 
 
 [15]
 Compare the comments of Commissioner Owens on the brief filed by the S.E.C. staff in the Continental case:
 Some commentators have suggested (and I believe there is merit in their suggestions) that this language (in the S.E.C. brief) could be read to mean that a permissible private placee must have a position with the company similar to that of an insider in the 10b-5 sense. If such an interpretation were to prevail, it could lead to such a narrowing of the exemption that even an institutional investor could not qualify. This is certainly not a conclusion which I can support; in fact, I do not believe it was intended by the Commission. My interpretation of the Commission's position in this case is that (1) the offerees must be shown to have access to material information concerning the issuer and (2) the access criteria cannot be met by merely providing, gratuitously, a promotional prospectus purporting to afford instant access and by having each offeree and purchaser sign a letter saying he has received and read such document.
 Address by Commissioner Hugh F. Owens before the National Association of Securities Dealers, Inc., reported in 152 BNA Sec.Reg. & L.Rep. at G-2 (May 17, 1972).